( Decided December 5th, 1862.)

---

MAYNARD McPHERSON, and others, *vs.* CHARLES A. SNOWDEN, and others.

Where, in a declaration of uses, the word "issue" is used both in connection with the disposition of the rents and profits, and the disposition of the *corpus* of the estate, it justifies the application to the term thus used, the rule that technical words are to be construed more strictly in a deed or grant, than in a will.

In a will, the word "issue" is not a technical expression, implying *prima facie* words of limitation, but will yield to the intention of the testator, to be collected from the words of the will. In a deed or grant it is otherwise.

The word "issue," in its natural, and often in its legal sense, means children, and is a word of purchase.

The declaration of uses was, in effect, as follows: "In trust for the use of the four daughters of A, (the declarant,) and their issue, so that during the life of the longest liver of the said four daughters, they and the survivors and survivor of them, and the issue of any of them who shall have died, shall receive the rents and issues of the real estate mentioned; the child or children of any deceased daughter of A, to take the part or portion which their or its parent would, if living, be entitled to, and from and after the death of all the aforesaid daughters of A, then for the use of all the issue of all the daughters of A, and their heirs, in fee-simple."
HELD:

1st. That the words "*all the issue of all the daughters,*" exclude the idea of a representative right through the daughters, and make that issue, or the children of the daughters, the immediate and equal recipients of the bene-

fits of the grant. And if the issue of the daughters take in their own right, and not by representation, they take *per capita* and not *per stirpes*.

2nd. That the issue or children of the daughters—two unmarried daughters yet surviving—take a vested remainder, dependent upon a life estate *pur auter vie*, that is, for the lives of the surviving aunts, or the life of the survivor of them, subject, however, to open and let in any after-born child or children who might be born during the life estate of the aunts, or the survivor of them, to participate in the fee.

3rd. That under the grant in this case, it does not follow, because the issue of the daughters take *per capita*, that they become joint tenants with the right of survivorship.

R, a grandson of one of the daughters of the declarant, conveyed by deed of mortgage to P & M, "all the title and interest he may or will possess, either in his own right, or as heir-at-law of his deceased mother, by reason of all or any of the deeds, conveyances or declaration of uses" mentioned in the deed of mortgage. HELD: That the share to which R was entitled, as one of the heirs-at-law of a deceased sister, did not pass by the terms of said deed of mortgage.

Where attachments were issued on sundry judgments against the said R, and laid in the hands of the trustee, for the sale of the real estate decreed to be sold for distribution—HELD: That the process of attachment is a special statutory remedy, and in resorting to it, the terms of the law conferring it must be strictly pursued; the jurisdiction being exclusively in a Court of Law, and in a case where, from a conflict of jurisdiction, or from other causes, the remedy by attachment is not full and complete, a Court of Equity would seem to have no power to pass any order to aid or perfect it.

APPEAL from the Equity Side of the Superior Court of Baltimore city.

This is a proceeding by bill in equity, filed by the appellees against the appellants, on the 27th of November 1857, for the sale of the real estate of Margaret Dorsey, deceased, (formerly Margaret Hudson,) lying in the city of Baltimore. The appeal is from a *pro forma* order of said Court, sustaining the complainants' exceptions to account B, and ratifying account C, reported by the auditor of said Court, distributing the net proceeds of the real estate sold under a decree passed in said proceedings. The case is so fully stated in the opinion of this Court, as to render any

further statement here unnecessary, except as to matters referred to in said opinion, but not incorporated therein.

By the answer of Penn & Mitchell, filed in the cause on the 5th of February 1858, and exhibits P. & M., No. 1, and No. 2, as well as by the answer of Richard N. Snowden, one of the children of Ann Rebecca Snowden, deceased, it appears that the said Richard N. Snowden, being indebted to the said Penn & Mitchell in the sum of $5,000, on his bond or writing obligatory, to secure the payment of said indebtedness, conveyed to them, by mortgage dated the 10th of July 1856, "all title and interest he may and will possess, either in his own right, or as heir of Ann Rebecca Snowden, by reason of all or any of the deeds, conveyances and declarations of uses hereinbefore recited and referred to," in the real estate of said Margaret Dorsey, deceased; that upon the non-payment of said indebtedness, in conformity with the requirements of the said mortgage, the said Penn & Mitchell proceeded to procure the foreclosure of said mortgage, obtained a decree for the sale of the interest of the said R. N. Snowden in the aforesaid real estate, and, at the trustee's sale under said decree, became the purchaser of said interest, and received the deed of the trustee therefor. By virtue of their said proceedings, Penn & Mitchell "claim an equal interest in said property, as the assignees of the said Richard N. Snowden, with the other children of the said Ann Rebecca Snowden."

The petition of Joshua Turner, Joseph Turner, William Robinson, and Henry James, states, that the said petitioners recovered judgments, at the October term, 1857, of the Circuit Court for Anne Arundel county, against the said Richard N. Snowden, then of said county, but afterwards of Baltimore city, the said Turners for the sum of $451.54, with interest and costs, the said Robinson for the sum of $997.95, with interest and costs, and the said Henry James for the sum of $447.55, with interest and costs; that *fi. fas.*

were issued on said judgments to the sheriff of Anne Arun-del county, and severally returned "*nulla bona;*" that writs of attachment, directed to the sheriff of Baltimore city, were afterwards issued on said judgments, and by him laid in the hands of S. Teakle Wallis, J. Shaaff Stockett, and F. H. Stockett, trustees for the sale of the real estate of Margaret Dorsey, deceased; and asks that the Court "will order and direct the said trustees, out of the interest of the said Richard N. Snowden in the aforesaid proceeds of sale, to pay to your petitioners the said sums of money, interest and costs, so as aforesaid severally and respectively re-covered by them against the said Snowden."

It appears, from the record, that Ella Snowden, another of the children of the said Ann Rebecca Snowden, died in-testate and without issue, on the 11th of April 1858, where-by her interest in the said property vested in her surviving brothers and sisters.

The claim of the Savings Bank of Baltimore, is under a mortgage dated October 13th, 1845, executed by Marga-retta Nicols, Thomas Snowden and Ann Rebecca Snowden, to said bank, on their interest in certain real estate of Mar-garet Dorsey, deceased, securing the payment of certain promissory notes therein mentioned.

The claim of Henry V. D. Johns and Montgomery Johns, executors of John Johns, deceased, is upon two mortgages executed by Peregrine Fitzhugh and Sarah Margaret Fitz-hugh, his wife, and J. Hudson Pottinger, to the said John Johns, of their interest in the property in the proceedings mentioned, the first dated the 20th of December 1843, and the second the 6th of November 1850, to secure the pay-ment of two promissory notes mentioned in said mortgages.

In pursuance of an agreement of the parties, recited in the opinion of the Court, a *pro forma* order was passed by the Court below, (LEE, J.,) sustaining the exceptions of the com-plainants to account B, and ratifying account C, reported by

the auditor of said Court, and further ordering "that the sum awarded by said account C, to R. N. Snowden, be paid to his attaching creditors, the Turners and the other petitioners in this cause, in proportion to their respective claims." From this order the defendants appealed.

The cause was argued before BARTOL, GOLDSBOROUGH and COCHRAN, J.

*I. N. Steele,* for the appellants, the McPhersons:

The controversy in this case, it is to be observed, grows out of limitations *in a deed,* and the rule of construction in such cases requires a much stricter adherence to settled principles than is adopted in the cases of *wills.* In the former, terms are used having a fixed meaning, which meaning Courts invariably give to them; while, in the latter, frequently prepared with less deliberation and care, a much greater looseness is tolerated, for the purpose of effectuating the intention of the testator, which, it is assumed, an adherence to the technical signification of legal terms in such instruments, might frequently defeat.

The solution of the question in this case depends upon the true meaning of a few words; and in arriving at that meaning, upon a construction of the language of the deed, there is this cardinal rule to be borne in mind, viz: that where the same term is used in different portions of the same instrument, the same meaning is to be given to it wherever it is thus used, unless the context contains something clearly indicative of a contrary purpose. Examples of this are constantly occurring, and may readily be found in the cases to which we refer as distinctly declaring the rule of construction we have stated. *Ridgaway vs. Munkittrick,* 1 *Dr. & War.*, 89, 92 and 93. *Woodland vs. Wallis,* 6 *Md. Rep.,* 166. *Adams, et al., vs. Law,* 17 *How.,* 422, and cases on p. 202.

26      v.19

Bearing clearly in mind this rule, so obviously well-founded and resting upon the highest authority, what construction is to be put upon the language employed by the grantor?

It is plain beyond question that the estate of the daughters of the declarant was simply one during their lives. The rule in Shelley's case can, therefore, under no possible theory, have any application here, and the word "issue," consequently, whatever may be its general force elsewhere, is here clearly a word of purchase, and the "issue" of the life-tenants, (the daughters of the declarant,) whether they be *descendants* generally, or *children*, take as purchasers. 1 *Fearne on Contingent Rem.*, 106. 2 *Fearne on Contingent Rem.*, ch. 13, sec. 505, and the whole chapter. *Horne vs. Lyeth*, 4 *H. & J.*, 439. *Doe dem. Cooper vs. Collis*, 4 *Term*, 299. 13 *Md. Rep.*, 424, *Tongue vs. Nutwell*. 15 *Md. Rep.*, 190, *Simpers vs. Simpers*.

The ordinary meaning of the word "issue" undoubtedly is *descendants;* it is a term of comprehensive import, but the theory of the appellants is, that in this deed it was used as synonymous with children. This view is conclusively established by that parenthetical clause of the deed, which declares that the *children* or *child* of any deceased daughter shall take the portion which their or its *parent* would, if living, be entitled to; also by the terms of the last clause, which provides, "that from and after the death of all the aforesaid daughters, &c., then for the use of *all* the *issue* of *all* the daughters, and their *heirs, in fee-simple*." Why use the words, "heirs, in fee-simple," if the previous word, "issue," of itself, was designed to have the comprehensive meaning which *must* be given to it in order to support the opposite theory? No other view reconciles, in this respect, all the clauses of the deed, and were there even no authority for it, it would commend itself most readily to the judgment of the Court. It will be found, however, abundantly

supported by the cases. Indeed, this point seems hardly open to dispute, for it will be perceived, on reference to the suggestions of the solicitor of the appellees, the Snowdens, that he uses the words, *"issue or children,"* throughout as synonymous. *Adams vs. Law,* 17 *Howard,* 422. *Carter vs. Bentall,* 2 *Beavan,* 557. *Swift vs. Swift,* 8 *Simon,* 168. *Fitzgerald vs. Field,* 1 *Russell,* 430. *Needham vs. Smith,* 4 *Russell,* 318. *Ridgeway vs. Munkittirick,* 1 *Drury & Warren,* 84. *Peel vs. Catlow,* 9 *Sim.,* 373. *Jennings vs. Newman,* 10 *Sim.,* 223. *Tawney vs. Ward,* 1 *Beav.,* 563. *Winn vs. Fenwick,* 11 *Beav,,* 438. *Campbell vs. Sandys,* 1 *Schoales & Lefroy,* 281. *Sibley vs. Perry,* 7 *Vesey,* 526, 528, 529. 2 *Jarm. on Wills,* 353, 354, 355. *Pruen vs. Osborne,* 11 *Simons,* 132, 137. 5 *Barn. & Cress.,* 856. 12 *Eng. C. L. Rep.,* 393, *Wright vs. Trebor.*

The effect of this is to give to the *children* of the life tenants, vested remainders in the property in question, to take effect in possession upon the death of the longest liver of the daughters. So long as any one of the said daughters survives, she and the *children* of each of her deceased sisters receive the income arising from the property; such children, under the express limitation of the deed, to take the share of *such income* which their respective parent would, if living, have taken; that is to say, during the life of the Misses Hudson, they each receive one-fourth of the income from the property: Mrs. Fitzhugh, representing all the "issue" (three children) of her mother, Mrs. Pottinger, receives one undivided fourth for life, and the Snowdens, representing the "issue" (one child) of Mrs. Nicholls, receive the other undivided fourth for life. In this manner, during the life of any of the daughters of the declarant, the estate is held.

If we are right in these views, it follows—first, that "issue" means *children;* and second, that the "issue" take, as purchasers, vested remainders in the property in ques-

tion—such vested remainders to take effect in possession upon the death of the last survivor of the life tenants, and being liable to open and let in, during the pendency of the life estate in the daughters, after-born children of any of the daughters. The persons who are to take, and the nature of their estate, being thus established, the next inquiry is, how and in what proportions the property is to be divided among them under the clause of the deed, which declares, that "*from and after the death of all the aforesaid daughters of the said Margaret Dorsey, then for the use and behoof of all the issue of all the daughters of the said Margaret Dorsey and their heirs, in fee-simple?*"

It is obvious, from the very strong language used by the declarant—"from and after the death of *all*," &c.,—that she designed, upon the happening of that event, to make an entirely new order of distribution. All the class entitled to take—viz., the "issue" (children) of her daughters—stood to her in precisely the same degree of consanguinity; they were all her grand-children, equally objects of her bounty. The "issue" of her daughters, as they successively came into existence, being entitled to vested remainders as a matter of legal construction, were competent to dispose of such vested estate by deed or will, and of course, therefore, in case of the death of any of them, without making any such disposition, before the final destruction of the life estate by the death of the last of the daughters of the declarant, the right heirs of such deceased "issue" would receive the interest of such deceased "issue."

The declarant, after providing for her daughters, goes on to provide for all the issue (children) of all her daughters, as one class, without distinction among them, and she does this by words of purchase, which constitute them the source of a new descent. Under such a provision, they clearly take *per capita* and not *per stirpes*, unless it is qualified by the language of other parts of the deed.

And it is accordingly contended, on behalf of the Snowdens, that our construction cannot be adopted, because it conflicts with the apparent intention of the declarant, as derived from the preceding clause of the deed, that the children or child of any deceased daughter should take the portion their or its parent would, if living, be entitled to." But it is obvious that this clause was designed to apply solely to the "limitation of the estates to the daughters for their lives." It is, as the solicitor for the Snowdens, in his instructions to the auditor, himself admits, more immediately connected with that limitation; and no one can read the deed without perceiving that the declarant had in her mind two distinct provisions: one as to the *income* during the life of the longest liver of the daughters, and the other as to the *property itself*, "from and after the death of *all* the daughters." The rule is, that the intention of the declarant, as gathered from the terms used by her in her deed, construed according to well settled principles, is to govern. Now we look in vain for any manifestation of an intent that this "clause should be associated with and control, in construction, the ultimate limitation over to the issue of all the daughters and their heirs, in fee." On the contrary, the opposite intent is plainly deducible from the *omission* of the clause in the ultimate limitation, and its *insertion* in the first limitation, in an instrument carefully prepared, and by a skillful hand. Involving, as the construction on the other side would, a disregard as well of the punctuation as of the collocation of the clause in the deed, and also making, as its natural effect, one grand-child, (Mrs. Snowden,) equal to three grand-children, (Mrs. Fitzhugh, Mary B. Pottinger, deceased, and John H. Pottinger,) it ought not to be adopted unless it distinctly appears that such was the purpose of the declarant. Suppose, as a means of testing this question, that all four of the daughters of the declarant had married and had issue or chil-

dren—Mrs. Nicholls, one; Mrs. Pottinger, three; Sarah Hudson, four; Rebecca Hudson, six. The rule sought to be established by the solicitor for the Snowdens would give to the *one* child of Mrs. Nicholls precisely as great an interest as would be received by the *six* children of Rebecca. The probabilities, so far from being in favor of such an intention on the part of the declarant, would rather seem to be directly the reverse; and it would require the most unmistakably clear and explicit language in the context to induce the Court to change and qualify the natural and ordinary meaning of the last clause of the deed, by giving to it such an interpretation, especially when that interpretation would be in disregard of the general rule of law, broadly laid down by the whole current of authorities in such cases.

When, in addition to this, we come to examine closely the words used by the declarant, "then for the use of *all* the issue of *all* my daughters, and their heirs, in fee-simple," it is difficult to resist the conviction that she designed them to take in equal proportions, or *per capita.*

In support of these views, we refer to the following authorities: *Davenport vs. Hanbury,* 3 *Vesey,* 257. *Barnes vs. Patch,* 8 *Vesey,* 607. *Lady Lincoln vs. Pelham,* 10 *Vesey,* 176. *Leigh vs. Norbury,* 13 *Vesey,* 340. *Butler vs. Stratton,* 3 *Brown Ch. Rep.,* 369. 2 *Powell on Devises,* 303 & 330, 331, side. 22 *Law. Lib.,* 161, &c. *Campbell vs. Wiggins, Rice's Eq. Rep.,* (*S. C.,*) 10. *Wessenger vs. Hunt,* 9 *Richardson Eq.,* 471, 472, *Maddox vs. The State,* 4 *H. & J.,* 540. *Dyer vs. Dyer,* 1 *Mer.,* 414. *Lugar vs. Harmon,* 1 *Cox,* 250. *Lark, et al., vs. Linstead,* 2 *Md. Rep.,* 420. *Keerl & Fulton vs. Fulton,* 1 *Md. Ch. Rep.,* 532. *Boulton vs. Beard,* 27 *Eng. Law & Eq. Rep.,* 421. *Stillinger, Ex'r of Riddlemoser, vs. Riddlemoser,* decided in this Court in 1843, but not reported. See *Lib. R. W. G., No. T., folio* 12.

*Robert J. Brent*, for the appellants, Penn and Mitchell:

During the continuance of the life-estate, the grand-children of M. Nicols take part of the annual rents, *per stirpes*. The words "children" and "issue," are, in this trust, synonymous. 2 *Jarman on Wills*, 375. In this case the rights of all issue now living, are vested *sub modo*, that is, liable to shift or fluctuate, until the life-estate expires, and the fee-simple interest becomes fixed, absolutely and unchangeably. 4 *Kent Com.*, 205, 206. This is not a common law conveyance, but the legal title remains in Graham until each use successively arises, and there seems to be no legal estate in the remainder-men until after the death of the surviving tenant for life. *Roe Dem Wilkinson vs. Tranmarr, Welles Rep.*, 682. *Doe Dem Dyke, vs. Whittingham*, 4 *Taunt.*, 22. *Watk. Conv.*, 235. *Wilk. on Conv.*, 146. 4 *Cruise's Dig.*, 100, *sec.* 3. We therefore say, that this is no case of a vested remainder, but merely of a future use, to vest at the death of the surviving tenant for life. The question is new and difficult, but we hold that the distribution is to be among all the issue living at the time of distribution, *per stirpes*, and not *per capita*. 3 *Cruise's Dig.*, 355, *secs.* 26 and 27. *Fearne*, 106. 4 *Kent*, 389 and 390. We see no reason why a distribution of the revenues during life should be made to the issue of a deceased parent, *per stirpes*, and a different principle applied to the fee-simple distribution. *Alder vs. Beall*, 11 *G. & J.*, 123.

The final distribution of the property in this case, is postponed until the death of the surviving daughters of Margaret Dorsey, when the distribution is to be made among a class of individuals, viz., all the issue of all the daughters of Margaret Dorsey, as described in both of the settlements, and their heirs, in fee-simple. In such a case, the time of distribution fixes the vesting of the interests among the persons *in esse* at the time of the distribution.

1 *Rop. Leg.*, 54. *Andrews vs. Partington*, 3 *Bro. Ch. Rep.*, 402 and 404. *Hughes vs. Hughes, Ibid.*, 435. *Barrington vs. Tristram*, 6 *Ves.*, 345. *Whitebread vs. St. John*, 10 *Ves.*, 152. *Hughes vs. Hughes*, 14 *Ves.*, 258. 2 *Jarm. on Wills*, 714 and 726. 1 *Rop. Leg.*, 589. 2 *Wil. on Exrs.*, 982. *Fleetwood, et al., vs. Fleetwood, et al.*, 2 *Dev. Ch. Rep.*, 222. 2 *Cruise's Dig.*, 269, *sec.* 24.

This, then, is a case where no right to the contingent remainder can vest, until the expiration of the life-estate, an event *in futuro*. The effect of this is to overthrow all the mortgages which have been executed, so far as they absorb the proceeds of the real estate, and are covered by the exceptions of Penn and Mitchell. The contingent remainder, which may vest in Richard N. Snowden, the mortgagor to Penn and Mitchell, is assignable in equity before it vests, and therefore we have the right to except. 2 *Cruise's Dig.*, 439. 3 *Lead. Ca. in Eq.*, 307, 308. *Redfield on Railways*, 500.

The following authorities are referred to as further illustrating the meaning and use, in cases like this, of the words "children," "issue," "heirs," &c. 2 *Jarm. on Wills*, 83 and 375. *Young vs. Robinson*, 11 *G. & J.*, 328. 2 *Will. on Exrs.*, 982 and 999. *Ware, et al., vs. Richardson*, 3 *Md. Rep.*, 544, 545. *Ridgaway vs. Munkittrick*, 1 *Dr. & Wr.*, 84. *Barnes vs. Patch*, 8 *Ves.*, 606. *Dominick vs. Sayre, et al.*, 3 *Sandf.*, 555.

The intention is to be gathered, in cases of wills, from the whole context of the will. *Dashiel vs. Dashiel*, 2 *H. & G.*, 127. The intention that the issue shall take *per stirpes*, in one part of a will, presumptively guides in the final distribution. *Rowland vs. Gorsuch*, 2 *Cox*, 187. 16 *Beav.*, 435. 1 *Coll.*, 365. 1 *De G. & Sm.*, 355. 2 *Will. on Exrs.*, 1363, 1364. The result, therefore, is that Richard N. Snowden's contingent or vested right to the property, at the period of distribution, was assignable to Penn

and Mitchell, and when that period arrives, he will take as one of the issue then living.

*F. H. Stockett*, for the appellees:

The word "issue," when not restrained by the context, is co-extensive and synonymous with descendents, comprehending objects of every degree. *Haydon vs. Wilshere*, 3 *Term R.*, 372. *Davenport vs. Hanbury*, 3 *Ves.*, 258. *Horsepool vs. Watson*, 3 *Ves.*, 383. The word "issue," unconfined by any indication of intention, includes all descendants, and they take *per capita. Leigh vs. Norbury*, 13 *Ves.*, 340. 2 *Jarm. on Wills*, 33. Intention is necessary to limit the sense of the word "issue" to children. 5 *Munf.*, 440. 2 *Jarm. on Wills*, 37. *Sibley vs. Perry*, 7 *Ves.*, 532. *Woodland vs. Wallis*, &c., 6 *Md. Rep.*, 152. The word "children," may be construed to mean "issue," instead of abridging the word "issue" to children. *Wyth vs. Blackman*, 1 *Ves.*, *Sr.*, 197. 2 *Jarm. on Wills*, 37. *Dalzell vs. Welch*, 2 *Simon*, 319. If no children are in being, grandchildren would come in under the word "children," and may be thereby described. *Crooke, et al., vs. Brookling, et al.*, 2 *Vern.*, 106. "Issue," in a will, has been held, on the context, to have two different meanings. *Carter vs. Bentall*, 2 *Beav.*, 551. Provision by deed for "children," is sometimes held to extend to grandchildren and great-grandchildren, and they take *per stirpes*, and not *per capita. Wythe vs. Thurlston*, *Ambl. R.*, 555. *Gale vs. Bennett*, *Ambl. R.*, 681. *Royle vs. Hamilton*, 4 *Ves.*, 437. *Chilton vs. Henderson*, 9 *Gill*, 432. *Ware vs. Richardson*, 3 *Md. Rep.*, 505. *Torrence vs. Torrence*, 4 *Md. Rep.*, 11. *Tongue vs. Nutwell*, 13 *Md. Rep.*, 415. 4 *Kent Com.*, 345, (*note d.*) *Id.*, 419. *Needham vs. Smith*, 4 *Russ.*, 318. *Cutter vs. Doughty*, 23 *Wend.*, 522. *Ruff vs. Rutherford*, 1 *Bailey Eq. Rep.*, 7. *Hallowell vs. Phipps*, 2 *Whart.*, 376. *Dickinson vs. Lee*, 4 *Watts*, 82. *Pope vs. Pope*, 9 *Eng. L.*

& *Eq. Rep.*, 193. *Bryan vs. Mansion*, 15 *Eng. L. & Eq. Rep.*, 455. *Re Winch's Trust*, 27 *Eng. L. & Eq. Rep.*, 375. *Levering vs. Levering*, 14 *Md. Rep.*, 30.

*Thos. S. Alexander*, on the same side:

The intent of the party governs in the interpretation of every instrument of writing. Where technical expressions are introduced, they receive, ordinarily, their technical construction; and the more ·readily where they are found in deeds and other instruments made *inter vivos*. But even in deeds, terms of art may be controlled by the clear expression of a different intent. In *Budd vs. Brooke*, 3 *Gill*, 198, 234, the Court of Appeals say: "In construing a grant, it is the duty of the Court first to ascertain what the parties intended should be effected by it. And that intention being collected from an inspection of the grant itself, it is the duty of the Court to give it such an interpretation as will effectuate that intention, provided the terms and expressions used in the grant will admit of such construction."

The word "issue" is susceptible of such various meanings that it can hardly be treated as a technical expression. If used in a deed, without any explanation from the context, it is a word of purchase; but it may be used as a word of limitation. Ordinarily, it embraces descendants in every degree; but it may import children only. "Children" usually signifies descendants in the first degree; but it may be used to include grandchildren and descendants yet more remote. "Issue" may, therefore, mean "children;" and "children" may be the synonym of "issue." In any and every instrument, therefore, those words are to receive just such construction as may best advance the intent of the party.

There is nothing, therefore, in the letter used to prevent the Court from gratifying the intent of Mrs. Dorsey, in

declaring the uses of this deed. What, then, was her intent? She intended to provide equally for her daughters, and for the descendants of her daughters—giving to the descendants of a daughter a child's part of the estate. There is nothing on the face of the deed from which we can presume an intent to prefer one daughter at the expense of another. In such case equality is natural equity. The same rule of natural equity gives the mother's part to her descendants. The principle of representation was parcel of the common law; and is engrafted into our Acts to direct descents, and for distribution of an intestate's estate. The rule of positive law concurs, therefore, with the dictate of natural equity; and must govern in the construction of this deed, in the absence of a contrary intent clearly expressed on its face.

The limitation is to the daughters and their issue; and all that follows is explanatory of this limitation.

Thus it is declared, that the uses shall enure in the *first* place to the daughters "and the survivors and survivor of them, and the issue of any of them who shall have died," during the life of the longest liver of the daughters; and *next*, from and after the death of all the daughters, to "all the issue of all the daughters * * and their heirs, in fee-simple."

Now I agree with the appellants, that the word "issue" in the last clause, means the same with "issue" in the preceding clause. The combined effect of the two clauses is, therefore, to enlarge the estate of the issue, which by the first clause was *pur auter vie*, into a fee-simple.

The appellants insist, that by the limitation to "the issue," is meant "children;" that is, the descendants in the first degree from the daughter. They found this construction on the clause, "the child or children of any deceased daughter * * * to take the part or portion which their or its parent would, if living, be entitled to." Adopting this

interpretation as correct, the conclusion will be, that the uses are limited to the daughters for life, with remainder to their children, in fee. If "issue" in the first clause is equivalent to "children," and identical with "issue" in the last clause, no other conclusion is admissible.

But here the appellants would distinguish. The children of a daughter succeed to the estate *pur auter vie per stirpes;* to the estate in fee, *per capita.* They refer to the clause last quoted for the purpose of showing that "issue" means "children," but they repudiate the authority of that part of the clause which prescribes the manner in which the "issue" or "children" shall take. Now I insist that this clause in question is to be read in association with, and as part of, the last clause limiting the fee; or they are to be treated as altogether distinct and independent of each other. You cannot connect them for some purpose, and separate them for other purposes. The second clause is undoubtedly to be read with, and as part of, the first clause, and the effect of such reading is to convert "issue" into "child or children taking *per stirpes.*" When, therefore, it is insisted that "issue" in the last clause, is to be construed as "issue" in the first clause, it follows that "issue" means not simply "child or children," but "child or children taking *per stirpes.*"

When a word of art is used with other words explaining or qualifying its meaning, and the same technical word is used in a subsequent part of the instrument, nothing would seem to be more reasonable than that the words or explanation should be read in construction with the word thus repeated. And, in practice, nothing is more familiar than this repetition or transposition of words, and with a view to give full effect to the intent, to read the whole clause thus, (excluding unnecessary verbal repetitions,) *"to the daughters, and the survivors and survivor of them, and the issue of any of them who shall have died during the life of the longest*

*liver of the daughters; and from and after the death of all
the daughters, then to all the issue of all the daughters, and
their heirs, in fee-simple; the child or children of any de-
ceased daughter to take the part or portion which their or its
parent would, if living, be entitled to.*

The appellants object that this construction violates the
letter of the last clause, which limits the fee to "*all* the is-
sue of *all* the daughters." I answer that "all the issue"
means no more than "the issue;" and "all the daughters"
no more than "the daughters." And that (if "issue"
means "children") "all the children of all the daughters"
will enjoy the whole estate under a limitation to them, *per
stirpes*, just as effectually as they would or could enjoy it,
if it had been given to them *per capita.*

If "all the issue of all the daughters" are, by virtue of
the concluding limitation, to take the fee-simple *per capita*,
they must take jointly with the usual incident of survivor-
ship. And if the "issue" means "children," this fee
originally vested in the three children of Mrs. Pottinger,
and the only child of Mrs. Nicols, as joint tenants. Upon
the death of one of the children of Mrs. Pottinger, her in-
terest survived to her surviving brother and sister, and the
child of Mrs. Nicols. *And upon the death of this child of
Mrs. Nicols, (Mrs. Snowden,) her interest in the estate sur-
vived to the surviving children of Mrs. Pottinger; and thence-
forth the family of Mrs. Nicols were deprived of all hope of
sharing in any manner in the distribution of the estate.*

This consequence (unjust as it would be) is, I repeat, in-
evitable, if the distribution is to be made amongst "all the
issue of all the daughters *per capita.*" There is nothing
outside of the explanatory clause, which gives color for an
instant to the idea that the issue taking *per capita*, can
take as tenants in common. And if the concluding limi-
tation of the fee is to be read with the aid of the explana-
tory clause, no doubt will remain that the issue must take

the.fee (as it is conceded they take the estate *per auter vie*) *per stirpes*.

Whether, therefore, this last limitation is to be read with or without the aid of the explanatory clause, we shall have sufficient evidence of an intent on the part of Mrs. Dorsey to give the estate to the "issue" or "children" of her daughters by families.

In *Levering vs. Levering*, 14 *Md. Rep.*, 30, the rents and profits of an estate were given to two daughters. In the event of the death of either, her share of the rents and profits to go to her heirs during the life of the survivor. And on the death of both, the estate to be sold, and the proceeds to be distributed unto and amongst the heirs and representatives of the daughters, and their heirs. The differences between the two cases are verbal merely. In one case, the tenants for life are four in number; in the other, two. In the one, the limitation over is to "issue;" in the other to "heirs." In *Levering vs. Levering*, the Court of Appeals construe "heirs" to mean "children;" as in our case we give like construction to "issue." The Court advert to the first clause, and thus conclude: "Having there clearly shown an intention to give to the children of one daughter the precise one-half of the estate which their mother had, no matter which of the daughters of the testatrix should die first, whether it might happen to be the one leaving the largest or smallest number of children, it would seem right to suppose the testatrix had a like intention of giving to the children of each mother the share 'of the mother, when providing for the death of both of them.'"

This inference of intention was deemed to be so clear as to render it unnecessary to sustain it by reference to authorities. It would not become me, therefore, to enter upon a task which the Court declined. Nor can I presume to enlarge on the reasons by which the decision of the Court

is sustained.   I must content myself with suggesting that, as in *Levering vs. Levering*, there were only two daughters tenants for life, and the final distribution was to be made between the families of the two, the question of joint tenancy and its effect in construction, could not possibly be raised in that case.   The present case is, therefore, stronger than in *Levering vs. Levering*, by the influence which may be given to the argument, that the effect of allowing a distribution amongst "all the issue of all the daughters" *per capita*, will be not to lessen the interest which the Snowdens would otherwise take, but to exclude that family altogether from sharing in the estate.

*William Schley*, for the appellants, in reply:

It is erroneously assumed, in the argument of the appellees, that we associate the clause, "the child or children of any deceased daughters * * * to take the part or portion which their or its parent would, if living, be entitled to," with the ultimate limitation in the deed for some purposes, and reject such association for other purposes.   So far are we from doing this, that we have expressly contended that this clause, by its collocation, by the ordinary grammatical construction of the sentence, and by the apparent intention of the declarant, belongs exclusively to the first limitation. Our proposition is, that the declarant having, in the first limitation, clearly indicated that she uses the word "issue" as meaning "children," that word, when found in other parts of the instrument, must have the same meaning, unless a contrary intention is shown.   This is a well established rule, in the construction of deeds and other written instruments.   Its object is to fix the meaning of a "word" or "words" used more than once in a written instrument, and it gives no countenance to the idea, that the whole of a provision which, in any given clause of such instrument, has enabled a Court to fix the sense in which a particular

word is used, shall be incorporated in every clause in which that word may be afterwards repeated. To do this, would be, instead of interpreting an instrument, to make one for the parties, and would lead to what is intimated by the argument of the appellees, viz., the breaking up and transposition of the provisions of the deed.

It is next urged, on behalf of the appellees, that if the last limitation of the deed is not explained and controlled by the provision in the first limitation already quoted, then the children of Mrs. Pottinger and Mrs. Nicols took the fee in joint tenancy; and, consequently, when Mrs. Snowden died, her share passed to the surviving joint tenants, and her children, the appellees, were left unprovided for, and are not entitled to any part of the fund now in Court for distribution. This unjust and unreasonable result (based on the assumption that we affirm a joint tenancy) is relied upon to shew that our construction of the last clause of the deed must be wrong. Practically, the question whether the "issue" took as joint tenants, or tenants in common, is not now of importance, because Mrs. Snowden and Mrs. Fitzhugh, each of them, mortgaged their respective interests in the property, and thus severed the joint tenancy, if it ever existed. *York vs. Stone,* 1 *Salkeld,* 158. *Simpson vs. Ammons,* 1 *Binney,* 176, 177. But is it true, that if the "issue" (children) take *per capita* under the last clause of the deed, they must be held to take as joint tenants? We have not so affirmed, and we maintain, indeed, the contrary theory. In this State, since the Act of 1822, ch. 162, a joint tenancy can only be created by express words, and the question, as to such a tenancy, arises in this cause only in relation to the deed of 1817, and not as to that of 1827. Independently of the said Act, this Court has said, in the case of *Chew vs. Chew,* 1 *Md. Rep.,* 171, that "the Courts of Maryland are imperatively required, by a long course of judicial decisions in

this State and elsewhere, to view with disfavor estates in joint tenancy, and to give the widest and most liberal construction to testamentary instruments, in order to defeat them, whenever it may be done." Even in England, Courts of Equity take, to use their own language, "a latitude" for the purpose of defeating such estates. With this disposition of the Courts, or, indeed, without it, we think there is enough in the last clause of the deed to shew that "the issue must take as tenants in common," and that otherwise the evident intention of the provision will be defeated. The limitation is to *all* the issue and *their heirs*, and it cannot properly receive the same construction as a limitation simply to the issue and their heirs. Some meaning must be given to the word "*all*," which cannot be arbitrarily rejected, as of no significance, as the argument for the appellees proposes; and we contend that "all," in the position in which it is here found, means "each one," and that the limitation to "all the issue and their heirs," means to "each one of the issue, and the heirs of each one," so that the heirs of all may take. If this be so, there is no joint tenancy. See *Bambaugh vs. Bambaugh*, 11 *Serg. & Rawle*, 191. *Galbraith vs. Galbraith*, 3 *Serg. & Rawle*, 392. Again, this Court has said, in the case of *Chew vs. Chew*, already referred to, that "to constitute an estate in joint tenancy, there must be unity of interest, unity of title, unity of time, and unity of possession." Now, in this case, where the remainder was to open to let in children as they were born, the estate could not vest in all the children at the same moment, and the unity of time, therefore, could not exist; and while we admit that wide exceptions to this unity are to be found in some of the old English authorities, we say that those exceptions would not now be sustained or tolerated by the Courts of this country, where estates in joint tenancy have been, by the several States, either abolished entirely, or restricted to

cases of creation by express words. To defeat an estate so repugnant to our ideas of justice as a joint tenancy, the least our Courts can do, is to hold strictly that it shall not exist, except in those cases where the four essential elements of its nature are found in combination. Besides, the words "*all* the issue and *their* heirs," without more, necessarily import that all the issue take the fee-simple *equally*, and it has been frequently held that the word "equally," without any words of division, will, in a devise, make the devisees tenants in common. 2 *Powell on Devises*, 371, and cases cited. The same rule would apply to a declaration of uses.

The notion of the existence of a joint tenancy is suggested, for the first time, in the printed argument. It is not mentioned in the brief of the appellees; nor was the notion even incidentally put forth in the oral argument. It is now invoked as a *dernier resort*. But, in truth, there is not the slightest ground for the theory. It is really begging the question. If the parties who are entitled are to take *per capita*, then each one will take a *several* interest; they will not take *one* interest as *a body* or class. There could be no persons who could take as issue of *all* the daughters. "By necessity of reason," they must, as Littleton says, take "as tenants in common." *Co. Litt.*, 184, *a. Elizabeth Huntley's case, Dyer*, 326, *a. Cook vs. Cook*, 2 *Vern.*, 645. *Perry vs. White, Cowp.*, 777. It is not necessary to quote Aristotle, as was done by the learned apprentice in the case of *Sharington vs. Strotton*, 1 *Plowden*, 303, to show that every child must have *a father*, as well as a mother. The four daughters could not, *de facto* or *de jure*, be parents of the same children. They would have several *families;* their issue, if any, would be of the daughters, *respectively*. Now, where persons take as issue of a particular *body*, they would take jointly, unless there were apt words to shew that they were to take severally. So,

where the limitation is made to persons who are to bear a designated relation to a particular party, or to particular persons who are married, or who may lawfully intermarry, there the persons take as *a class*, because of the identity of relation to a named person or persons. If, in this case, the remainder had been limited to "*my* grand-children," there the declarant would have made herself the *propositus*, and all grand-children of the declarant, by reason that she made herself the *propositus*, would have composed *a class*, to take *per capita* or *per stirpes*, according to the intention of the deed. And it is in cases of contingent remainders, where the estate is only to vest in persons, who shall sustain a specified relation to some designated person or persons, at the happening of the contemplated contingency, that this doctrine of taking *as a class* most generally applies. In such case they will take, either *per capita* or *per stirpes*, according to the intention to be gathered from the deed or will. But we rely on the doctrine, so plainly stated in 2 *Powell on Devises*, 330, 331: "Where a gift is made to the children of *several* persons, whether it be to the children of A and B, or to the children of A, and the children of B, they take *per capita,* and not *per stirpes*." And the reason is, that although there are two classes, in a certain sense, yet the children are to take as designated *individuals*, not as *classes*; each one is to take in his own right, *as purchaser*, and not under or through, or as the representatives of their respective parents; and it is inconsistent with the notion of separate individual rights, that they should *all* take *one interest.* As each one has a right, personal and individual, so each has an estate, separate and distinct from all the others. We hold the true exposition of the deed to be all the same as if the declarant had said, "to each and every child of any and of every of my daughters." The true rule is stated in note 3, to *Davenport vs. Hanbury*, 3 *Vesey*, 260, and which we quote: "Whether, under a de-

vise, children are to take *per capita* or *per stirpes*, depends
on the previous question, whether they are to take in their
own right, or by representation.   In the first case, they
take *per capita.*"   We agree that issue, as used in the de-
claration of uses, means *immediate* descendants.   We also
agree that the remainder, expectant on the determination
of the particular estate, vested immediately in the one
child of Mrs. Margaret Nicols, (afterwards Mrs. Snowden,)
and in the one child of Mrs. Isabella Pottinger, (now Mrs.
Fitzhugh,) and that as the two after-born children of Mrs.
Pottinger came into being, the vested remainder opened to
let them in.   This can constitute no case of joint tenancy,
for it lacks one of its essential elements—unity of time in
the vesting of the estate.   The time when the estate of
Mrs. Fitzhugh and Mrs. Snowden vested in them *as pur-
chasers*, is certainly not identical with that on which the
estate of Dr. Pottinger and his deceased sister, subsequent-
ly born, vested.   Here we separate.   *We* say that the re-
mainder opened to let them in, *as individuals*, on the same
footing and with the same rights as the two children who
were living when the declaration was made.   The counsel
for the appellees insist that it opened, indeed, to let them
in; but that the remainder then vested in them unequally,
that is to say, *per stirpes;* the one moiety, which had origi-
nally vested in the child of Mrs. Nicols, revested in that
child, *as the child of Mrs. Nicols*, in the same right and
plight as if there had been no opening to admit these after-
born children of Mrs. Pottinger; and that the other moie-
ty, which had originally vested in the one child of Mrs.
Pottinger, living at the date of the declaration, revested
in that child and her brother and sister, *as children of Mrs.
Pottinger*.   No case has been cited in argument which, in
our judgment, sanctions this qualification to the limita-
tion.   In all the cases cited, there were some controlling
words in combination with the limitation.   "Several,"

"respective," "heirs," "representatives," or some other significant language, will be found in every one of the cases cited and relied on by the appellees.

In connection with this point, we beg leave to cite the following paragraph from the opinion of Lord Hardwicke, in the case of *Rigden vs. Vallier*, 2 *Vesey's Cases*, 258: "But there are other reasons in the present case greatly strengthening it in favor of the plaintiff; first, this was a father providing for his children, and must be construed, therefore, to make a provision for their families; and it is not reasonable to think he should make it so that if one died, her provision should survive to the other, which is the consequence of a joint tenancy, and cannot be supposed to be his intent."

The argument for the appellees next relies on the case of *Levering vs. Levering*, 14 *Md. Rep.* That case establishes no general principle or rule of construction, but merely ascertains and decides what was the intention of the testatrix in the will then under examination, and the reasoning of the Court, by which the intention was then arrived at, is utterly inapplicable to the case now before the Court. In *Levering vs. Levering*, the first clause of the devise or bequest gives the half of the rents, issues and profits which had been enjoyed by the daughter first dying, to her heirs. The testatrix had "stocks and leasehold estate," but "no realty," and it is clear that, under this first clause, the whole interest or estate in the one-half devised to the said daughter for life, on her death passed to her heirs absolutely. When, therefore, by the second clause, a power is vested in the executor to sell the property on the death of the surviving daughter, that the proceeds may be distributed to and amongst the heirs and representatives of the two daughters, no new estate is given to the children of the daughter first dying; and as to them, it is simply the sale of property of which one-half already belonged to

them, without any provision in reference to the distribution of proceeds sufficiently clear or express to revoke the first devise and change the share which they were to take. This being the case, it was very justly to be inferred that the children of the daughter last dying, were to take the other half. Accordingly this Court says: "Having there (in the first clause) shewn an intention to give to the children of one daughter the precise one-half of the estate which their mother had, no matter which of the daughters of the testatrix should die first, * * * * it would seem right to suppose the testatrix had a like intention of giving to the children of each mother the share of the mother, when providing for the decease of both of them." Is not this reasoning clearly founded on the assumption that the children of the daughter first dying took an *absolute* and not a life estate under the first clause? If that clause had expressly given the children an estate *pur auter vie*, and had been followed by a second clause limiting the fee-simple in different language, as in our deeds of 1817 and 1827, it is manifest that this reasoning of the Court would have no applicability. In such a case it could not be said, that because a life estate was limited in a particular way to the children of the daughter first dying, therefore the children of the other daughter, or even those of the daughter first dying, must take the fee-simple under the second clause in the same way. Not only has the reasoning of the Court no application to our case, but the "verbal differences," as they are termed in the appellees' argument, between the will in Levering's case and the deeds in the case before the Court, are so numerous and important, that while there is some *general* similarity between the two cases, they differ in almost all the *particulars* by which the intention of the instruments is to be ascertained. In the deeds now under construction, the first clause, in which the provision that children are to take the shares of their parents is found,

gives expressly only an estate *pur auter vie*, and the second clause gives a distinct and different interest, viz., the fee-simple to "àll the issue of," &c., omitting such a provision. This Court cannot say, that because the declarant gave a life estate in a particular mode, she must have intended to give the fee-simple in the same mode. Probable or possible reasons or motives which may have influenced her in providing equally for the children of her daughters, as she had provided equally for the daughters themselves, during their lives, were sufficiently suggested during the oral argument, and will not be repeated here. There was nothing unreasonable in adopting equality as her guide in providing for her grand-children. The deeds, which by the natural and the technical construction of their language give the fee-simple to the issue *per capita,* were carefully and skilfully prepared; why, then, is the language of the deeds to be tortured or transposed, for the purpose of defeating a provision in itself reasonable and just? Nothing could call for or justify such a course, but a controlling and clearly declared intention of the grantor, and we confidently deny that there is any thing in the deeds to indicate an *intention* to give the *fee-simple* of the property to the children *per stirpes.*

The case of *Levering vs. Levering,* as it seems to us, was clearly a case in which *each* daughter was made the *stirps* of her own children; and *her* children were to take as *her* representatives. The word "heirs" is there found. Those children were to take as two several classes; it is not a case in which each child had a several and individual right, as here. And although it is true that the learned judge, in the opinion filed in that case, does invoke the antecedent provision, as to the income, as a reason for construing the limitation of the *corpus* in the same way, *per stirpes;* yet it would be doing injustice to the Court, and to the learned judge who prepared the opinion, to hold that

an illustration (very proper in the particular case) was intended as the annunciation of a new rule of interpretation, of universal application, in the construction of devises and deeds. We think that the result at which the Court arrived in *Levering vs. Levering,* was inevitable; because the children of the daughters, in that case, were manifestly entitled as the *representatives* of their respective mothers.

In the case now under consideration, the provision as to the income, and the limitation as to the *corpus,* are not, however, identical. In this respect it differs from *Levering vs. Levering.* In our case, Mrs. Nicols and Mrs. Pottinger are both dead, leaving issue; and the child of Mrs. Nicols, on her death, became entitled to one-fourth of the income, and the children of Mrs. Pottinger to one-fourth. Each of the unmarried daughters is entitled to one-fourth of the income. But when those unmarried daughters shall have departed this life, what is to pass under the limitation of the remainder? Not one-fourth and one-fourth, but the whole *four-fourths*—the *entire* estate. The children, therefore, are to take, not the precise quantity of estate and quantum of interest vested· in their mothers, but they are to take as well what their aunts held for life, as what their mothers held for life. It is impossible, therefore, we say, that they take by representation of their respective mothers, as they take under the limitation not only *more* than their mothers ever held, but take, as to one-half of the *corpus,* that which never could, *per formam doni,* have become vested in their mothers, in the events that have occurred in the family of Mrs. Dorsey.

GOLDSBOROUGH, J., delivered the opinion of this Court:

The bill of complaint in this case, was filed in the Superior Court of Baltimore city, in 1857, by the appellees, to obtain a decree for the sale of certain real estate lying in the city of Baltimore, formerly belonging to Mrs. Mar-

garet Hudson, who subsequently intermarried with John E. Dorsey.

The bill alleges that the property in question is of great value, not susceptible of division, and that it would be for the interest and advantage of all parties interested to sell it, and divide the proceeds between the parties entitled, according to their respective interests.

Upon the bill, answers and depositions, the Superior Court decreed a sale of the property as prayed, and no exception was taken to the action of the Court until the case was referred to the auditor, to state an account distributing the proceeds of sale.

The auditor, in the performance of his duty, designed to state an account as directed by the solicitors of Mrs. Fitzhugh, and also stated another account according to the view of the solicitors of the Snowdens.

These accounts are respectively marked B and C, in the record.

The solicitors of the parties in interest agreed, in the Court below, as follows: "For the purpose of a speedy decision of the questions involved in the distribution, that a *pro forma* decree shall be passed by the Court, allowing the exceptions filed by the complainants to account B, reported by the auditor, and distributing the fund according to account C, prepared and stated by the auditor, in accordance with the instructions of the complainants' solicitor; it is further agreed, that the respondents, or any of them, or any of the parties appealing from said decree, may raise on such appeal any questions affecting their respective interests, which may arise under the account thereby to be ratified, and may maintain any objections thereto which could have been taken in this Court."

In conformity with this agreement, the Superior Court passed a decree, and from this decree an appeal was taken.

It becomes our duty, in settling the conflicting claims of the respective parties, to advert to the origin of those claims, as they are presented in the record of this case.

Mrs. Margaret Hudson, being seized and possessed of valuable real estate at and near the intersection of Baltimore and South Charles streets, in the city of Baltimore, conveyed the same to William Graham, and his heirs, by deed bearing date the 11th day of August 1801, with power to Mrs. Hudson to declare the uses of this property, which, by deed dated the 10th day of May 1817, she did declare, as follows: "In trust, that William Graham shall hold the real estate for the use of Mrs. Hudson (then Mrs. Dorsey) during her life, and from and after her death, to hold all that three-story brick warehouse, at the south-west corner of Baltimore and Charles streets, for the use of Mrs. Margaret Nicols, the daughter of Mrs. Dorsey, and the heirs and assigns of Mrs. Nicols, forever, in fee-simple, and as to the remainder of said property, in trust for the use, benefit and behoof of the four daughters of the said Margaret Dorsey, namely, Sarah W. Hudson, Margaret Nicols, Rebecca Hudson, and Isabella Pottinger, and their issue, so that during the life of the longest liver of the said four daughters of the said Margaret, they and the survivors and survivor of them, and the issue of any of them who shall have died, be suffered and permitted to receive and take the annual or other rents and issues of the remaining portion of property mentioned and recited in the deed to William Graham, and the same apply to their separate uses respectively, without being in any manner subject to the disposition, power or control of their respective husbands, or in any wise liable or bound for the payment of their debts, contracts, or engagements; the child or children of any deceased daughter of the said Margaret Dorsey to take the part or portion which their or its parent would, if living, be entitled to, and from and after the

death of all the aforesaid daughters of the said Margaret Dorsey, then for the use and behoof of all the issue of all the daughters of the said Margaret Dorsey, and their heirs, in fee-simple."

Subsequently, on the 17th day of April 1827, Mrs. Nicols, together with William Graham, executed a deed for the property held by William Graham for the use of Mrs. Nicols, to John J. Donaldson, who, on the same day, reconveyed the same to Graham, in trust for the use, benefit and behoof of Sarah W. Hudson, Margaret Nicols, Rebecca Hudson, and Isabella Pottinger, and their issue, so that during the life of the longest liver of the said Sarah W. Hudson, Margaret Nicols, Rebecca Hudson, and Isabella Pottinger, they and the survivors and survivor of them, and the issue of any of them who shall have died, be suffered and permitted to receive and take the annual or other rents and issues of the aforesaid property, and the same to apply to their separate uses respectively, without being in any manner subject to the disposition, power or control of their respective husbands, or in any wise liable or bound for the payment of their debts, contracts or engagements, the children or child of any deceased one to take the part or portion which their or its parent would, if living, be entitled to, and from and after the death of all the said Sarah W. Hudson, Margaret Nicols, Rebecca Hudson, and Isabella Pottinger, then for the use and behoof of all their issue, and their heirs, in fee-simple.

So that the whole of this property became vested in William Graham, for the use of the four daughters of Mrs. Dorsey, in the manner stated in the deeds of 1817 and 1827. All the four daughters survived their mother.

Sarah and Rebecca still survive, unmarried. Mrs. Nicols had one daughter, Ann Rebecca, who intermarried with Thomas Snowden, and died in her mother's lifetime, leaving the children named in the record.

The other daughter, Isabella, intermarried with Thomas B. Pottinger, and had three children, Sarah, who intermarried with Peregrine Fitzhugh; Mary B. Pottinger, born in 1818, *and died between two and three years old;* and John H. Pottinger, one of the defendants, born in 1821. No question is made as to the manner of distributing the profits of the estate during the lives of the survivors and survivor of the daughters. But the children of Mrs. Pottinger insist that, on the death of all the daughters of Mrs. Dorsey, the principal estate is to be distributed amongst the children of the daughters *per capita;* that is to say, one-fourth part to the children and heirs-at-law of Mrs. Snowden, who was the only child of Mrs. Nicols, one-fourth to each of the surviving children of Mrs. Pottinger, in their own right, and the remaining fourth part to those surviving children, as survivors or heirs-at-law of their deceased sister. On the other hand, the children of Mrs. Snowden claim that the distribution is to be made to the children of the daughter *per stirpes;* that is to say, one-half part to the family or descendants of Mrs. Nicols, and the remaining half part to the family or descendants of Mrs. Pottinger.

By reference to the particular expressions used by the declarants, both in reference to the disposition of the rents, issues and profits, and in the disposition of the *corpus* of the estate, we find that the declarants use the word *"issue;"* and it justifies us in applying to that term, thus used, the rule, that technical words are to be construed more strictly in a deed or grant than in a will. In the latter, the word "issue" is not a technical expression, implying *prima facie* words of limitation, but will yield to the intention of the testator, to be collected from the words of the will. See 27 *Eng. Law & Eq. Cases,* 375. In the former, it is otherwise. In *Horne vs. Lyeth,* 4 *H. & J.,* 439, Judge Walter Dorsey very elaborately reviews this

subject, and lays it down emphatically: "That the word 'issue,' in its natural and often in its legal sense, means 'children,' and is therefore a word of purchase, no one will question."

In this case it is conceded on both sides, that the words "issue" or "children" are used as synonymous. Considering the two clauses in the grants or declaration of uses, to which our attention is directed, we are forcibly struck with the precaution taken by the declarants, in providing for the disposition of the rents, issues and profits. Specially connecting in that clause the issue or children with their parents, and making those parents not only the medium of enjoyment, but through them indicating the proportion to be enjoyed by their children. In reference to the *corpus* of the estate, the issue or children are aggregated into a class, with no relation to their parents which would indicate that the issue should take through them; and shows that the estates given to the children "were to be the ground-work of succession of heirs, or, in other words, the children were to be the *termini* for the succession to take its course from." See same case, 434. The terms of the grant, *"to all the issue of all the daughters,"* entirely exclude the idea of a representative right through the daughters, and make that issue, or the children of the daughters, the immediate and equal recipients of the benefits of the grant.

We think that it was successfully contended by the appellants' counsel, that the children of Mrs. Snowden and Mrs. Pottinger took a vested remainder, dependant upon a life-estate *pur auter vie;* that is, for the lives of the surviving aunts, or the survivor of them, subject, however, to open and let in any after-born child or children, to participate in the fee, and any who might be born during the life-estate of the aunts, or the survivor of them.

If, therefore, the issue of the daughters take in their

own right, and not by representation, they take *per capita*. See 3 *Vesey*, 260.   The issue in this case, when considered as a class, is illustrated and sustained by the following quotation from 2 *Powell on Devises*, 330, 331:   "Where a gift is made to the children of several persons, whether it be to the children of A & B, or to the children of A and the children of B, they take *per capita* and not *per stirpes*." It was contended by the appellees' counsel, that if the issue took the estate *per capita*, they became joint tenants with the right of survivorship.   This would by no means follow, under the circumstances of this case; for it is conceded that children born of the daughters during the life of the aunts, would be let in to take a share of the estate, as in the case of John and Mary Pottinger, who were not born at the time of the execution of the deed of 1817, and there being a want of unity of time in the vesting of their title, one of the ingredients of joint tenancy is wanting. Beside this, the unity of title was severed by the mortgages mentioned in the record, and as to the deed of 1827, no joint tenancy can be held to exist, because of the operation of the Act of 1822, ch. 162, which provides that no deed, devise, &c., shall be construed to create an estate in joint tenancy, unless it is expressly provided that the property conveyed by such deed, &c., is to be held in joint tenancy.

The case of *Levering vs. Levering*, 14 *Md. Rep.*, 30, was urgently pressed upon this Court, by the appellees, as demonstrative of the proposition, that the issue of the daughters, in this case, took the remainder of the estate *per stirpes*.

It may be conceded that, in some respects, there is a similarity in the two cases.   This, however, is a grant, and that the case of a will, in which the Court sought to gratify the intention of the testatrix.

We find in the case of *Levering*, that the Court say: "Having there (in the first clause) shown an intention to

give to the children of one daughter the precise one-half of the estate which their mother had, no matter which of the daughters of the testatrix should die first, whether it might happen to be the one leaving the largest or smallest number of children, it would seem right to suppose the testatrix had a like intention of giving to the children of each mother the share of the mother, when providing for the decease of both of them.''

It may, therefore, be well said, that the result at which the Court arrived, in *Levering vs. Levering,* was inevitable. Because, in construing the words of the will, the Court found the intention of the testatrix to be, that the children of the daughters should take the property as the representatives of their respective mothers.

In this case the words of the grant are not the same, and no such intention is expressed or to be inferred from the language employed. The *corpus* of the estate is not disposed of until the happening of the contingency of the death of all the daughters, and then it is given to all the children as a class, who must necessarily take *per capita.*

In our opinion, therefore, the rents, issues and profits are to be distributed as follows: One-fourth to the children or descendants of Mrs. Pottinger, one-fourth to the child or descendants of Mrs. Nicols, and one-fourth each to Sarah Hudson and Rebecca Hudson, the two unmarried daughters of Mrs. Dorsey, during their lives. Upon the death of both Sarah and Rebecca Hudson, the children of Mrs. Pottinger and Mrs. Nicols will take the whole estate *per formam doni, per capita;* that is to say, after the payment out of the fund of the costs of suit in this Court and the Court below, Mrs. Margaret Fitzhugh, representing the issue of Mrs. Pottinger, is entitled to two-thirds of the proceeds of the property which sold for $40,000, and three-fourths of the proceeds of the property which sold for $60,000; and the Snowdens, representing

the issue of Mrs. Nicols, are entitled to the other third in the first named property, and one-fourth of the proceeds of the latter.

The trustees are to be allowed, out of the proceeds of sale to which Mrs. Fitzhugh is entitled, the claim paid by them to the executors of John Johns. They are also to be allowed, out of the proceeds of sale to which the Snowdens are entitled, the claim paid by them to the Savings Bank of Baltimore.

Penn and Mitchell are entitled only to the distributive share of Richard N. Snowden, which he acquired as heir-at-law of his mother, Ann Rebecca Snowden.

The share of Richard N. Snowden, to which he is entitled as heir-at-law of his sister, Ella Snowden, is not, in our opinion, embraced by the terms of the deed of mortgage from Snowden to Penn and Mitchell, as those terms are confined to "all the title and interest he" (Snowden) "may or will possess, either in his own right, or as heir-at-law of Ann Rebecca Snowden, *by reason of all or any of the deeds, conveyances and declaration of uses*" mentioned in the deed of mortgage.

In disposing of the claims of Turner, James and others, as attaching creditors of Richard N. Snowden, upon an attachment laid in the hands of the trustees, we are to determine whether the fund in their hands, for distribution, can be reached by attachment before the distributive share of their debtor is ascertained by a final audit; and, if not, then to determine whether this Court has power, by any order, to give the attaching creditors the practical benefit of a judgment of condemnation of their debtor's distributive portion yet to be ascertained.

There are several cases in which it has been declared, that a fund in the hands of a trustee, for distribution in equity, is not liable to attachment before a statement and ratification of a final account. See 4 *Md. Ch. Dec.*, 412.

7 *G. & J.*, 421. In *Cockey vs. Leister*, 12 *Md. Rep.*, 124, the Court say, that an attachment would not lie before a final audit. We do not, however, understand from these cases that an attachment cannot be issued and laid in the hands of a trustee before a final account, and that it would not be effective upon a sum ascertained by such an account to be the distributive share of the debtor in the attachment, but that the process, before the account is stated, cannot affect the fund or the trustee, or compel any modification of the final account, for the benefit of the attaching creditor.

Assuming that these authorities justify the conclusion we have stated, it is obvious that the attaching creditors in this case have acquired no rights of which we can take cognizance, whatever their rights may be in a Court of Law, when the distributive share of their debtor is ascertained by the final audit.

The process of attachment is a special statutory remedy, and in resorting to it, the terms of the law conferring it must be strictly pursued; the jurisdiction being exclusively in a Court of Law, and in a case where, from a conflict of jurisdiction, or from other causes, the remedy by attachment is not full and complete, a Court of Equity would seem to have no power to pass any order to aid or perfect it.

The exceptions of Penn and Mitchell, we regard as disposed of in the opinion expressed by this Court on the several questions involved in this case.

*Decree reversed and cause remanded*
*for further proceedings*

(Decided December 5th, 1862.)