[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 299 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 300 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 302 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 303 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 305 
I think that the trustees took a fee in the premises in question by implication.
The devise to the daughters of the testator is not absolute, but (in the language of the will) "so that each may have and enjoy the income of an equal fifth thereof during their several natural lives." The testator then constitutes his executors trustees of their estate, authorizing them as such trustees "to take charge of, manage, and improve the same and to pay over to them, from time to time, the rents, interest and net income thereof." It is very obvious that a legal estate in the premises was necessary to enable the trustee to discharge these duties. (Oates v. Cook, 3 Burr. R. 1684; Doe v. Woodhouse, 4T.R. 89, 92; Fletcher on Trustees, 27; Greenleaf's Cruise,tit. 12, Trust, ch. 1, § 14, and note; Jickling's Analogy,p. 15, note.) To put the matter beyond a doubt, the testator has provided that *Page 306 
the net income should be paid to the daughters after marriage without the consent of their husbands, with like effect as if they were unmarried. If the husband took an estate by the curtesy, as he would if the fee vested in the daughter, he would be entitled to the rents and profits, and the separate provision for the daughter would be wholly ineffectual. (Greenleaf'sCruise, tit. 12, ch. 1, § 16; Doe v. Hoffman, 6 Adolph Ellis, 206; 2 Jarman on Wills, 202, 203, and cases cited.) Again, if the trust to receive rents and profits and pay them over to the daughters is authorized by the 3d subdivision of the 55th section of the statute of "Uses and trusts," the whole estate in law and equity, by the 60th section, vests in the trustees. (1 R.S. 729, § 55, sub. 3, § 60.) If not authorized, the trust is void, whatever may have been the intention of the testator. (Id. 727, § 1.)
Whether such a trust is within the statute is therefore the great question in the cause. The decision of the chancellor inGott v. Cook, affirmed the validity of a trust of this character. (7 Paige, 523.) The decree in that case was pronounced after an elaborate argument, with all the light afforded by the opinion of Judge Savage, in Coster v.Lorillard, and of Judge Bronson in Hawley v. James, and has never been reversed or shaken by any adjudication in this state, to my knowledge. As trusts are the peculiar subject of equitable cognizance, the principle thus established has become practically the law of the state. The same construction has been given to the statute by the superior court of the city of New-York, by the supreme court, sitting in the 6th district, by the same court in the first district in Mason v. Jones,¹ the decision in the last case being affirmed in this court upon an equal division of the judges. Nor is this all. In Parke v. Parke, in the court for the correction of errors, the point was distinctly presented, and the validity of a trust of this description affirmed by their judgment. The question should be at rest upon authority. The conflicting opinions of eminent judges are evidence that it was originally a doubtful question; and no one is authorized to assume now that he is infallibly right, to which ever side of the controversy he may incline. I shall adhere to the decisions that have been made, because upon such a question the judgment of the court of last *Page 307 
resort, sustained as it is by the authority of every other adjudication made upon the same subject, is entitled to respect here. If, however, the question is deemed open, I shall follow those decisions, because, I think them right, and the exposition they have given to the statute the correct one.
I shall confine myself to a review of the more prominent objections urged against the validity of a trust of this description. 1st. It is said that the trust authorized by the statute "to receive the rents and profits of land, and to apply them to the use of any person," by necessary implication
clothes the trustee with a discretion in the expenditure of the fund; that a trust to pay over the rents and profits to the beneficiary, deprives the trustee of all discretion and is consequently void. It should be remembered in considering this proposition, that the statute in reference to express trusts is merely permissive. It creates nothing. We might infer from the argument addressed to us, that the legislature had in the first instance annulled all trusts, and then proceeded to a new creation. It is more correct to say that they abolished all that they have not recognized as existing. The trusts preserved have their foundation in the common law, and their effect is to be determined by the application of common law principles. By that law the trustee must apply the trust fund according to the instructions of its author. His duty is the same now, if the directions given do not contravene the general object for which the trust is authorized by the statute. With this limitation the authority of the donor is as absolute now as before the statute. Now an express trust may be created according to the 3d subdivision of the 55th section, "to receive and apply the rents and profits of land to the use of any person." The subject is the rents and profits of land; the object, an application to the use of any person. When a trust is created of this nature, it is recognized as existing with all its common law incidents. The relation of the donor and trustee, the power of the former and the duty of the latter, are precisely what they were by the common law.
The statute no more prescribes the mode in which the profits must be applied, than the manner in which they are to be received. The details may be arranged by the donor in both cases *Page 308 
for himself, or left to the discretion of the trustee. If the trustee may apply the fund to the education of the beneficiary, where no instructions are given, (and this is conceded,) the creator of the trust may direct it to be done. Because, in either case, the application would be to the use of the person designated, and within the letter and spirit of the statute. It is believed that in all cases, before and since the statute, the rule is uniform, that the creator of the trust may direct specifically the performance of those things, which the trustee, whose authority is derived from him, might himself perform, in the lawful execution of the trust, if no specific directions were given. The proposition under review annuls this power of the donor. It transfers to the trustee alone, a discretion in the application of the fund, which the donor could exercise himself by the rules of the common law, and declares that the relation between the trustee and beneficiary is fixed by statute, and must be the same in all cases, any differences in the character or circumstances of the latter to the contrary notwithstanding. This theory is to be established, if at all, by implication. The statute says nothing of the discretion of the trustee; it speaks only of the power of the creator of the trust. It does not in terms compel a donor, who may be supposed to feel the strongest interest in the beneficiary, and to possess an equal knowledge of his character and necessities, to lean exclusively upon the discretion of a trustee, in the administration of his bounty. The implication should be strong, that leads to such results. I will glance briefly at the argument by which it is maintained.
And first, it is alleged that the legislature had in view a particular class or description of persons as beneficiaries. "Persons who could not safely be trusted with the management of their own affairs, and for that reason a trustee was allowed to make the application for them." (Hawley v. James, 16 Wend. 157;¹ 14 id. 321.)² The answer to this view is to be found in the law itself. The rents and profits arising from such a trust may be applied to the use of "any person," without regard to his condition, habits, character, or mental capacity. No judge or lawyer has ventured to deny this directly; or to assert that a trust for the *Page 309 
benefit of a millionaire, in the full vigor of health and intellect, is not as effectual, as though its subject was a lunatic pauper. And yet to support this construction it has been constantly assumed that the legislature, in this respect, intended not only what they have not said, but the reverse of what they have declared. This assumption, indeed, is indispensable to the support of the hypothesis under review. According to that, the trustee, as remarked, must always sustain the same relation to the cestui que trust. He is to exercise a kind of guardianship in the expenditure of the fund, (16 Wend. 158,)¹ and a guardianship of precisely the same character in all cases. Such a doctrine would be any thing but a necessary implication from a statute, which admitted all persons without exception to the class of beneficiaries.
To give plausibility to a doctrine which places all cestuis que trust upon the same statute level of incapacity, as to the management of their own affairs, a common disability must in some way be established. Hence the attempt in all the arguments addressed to us, and all the opinions delivered upon this subject, sometimes from the history of this section, and sometimes from its language, to group the beneficiaries into classes, between which there was some supposed resemblance, and as to all of whom, a guardianship of the kind alluded to might exist without manifest inconvenience or absurdity. (14 Wend. 321.) It is this preconceived notion, which has induced those by whom it was entertained, to restrict the obvious meaning of the words occurring in the third subdivision of this section. "Apply," for example, which means the act of applying, and includes obviously any act of the trustee, by which the trust fund is applied for the benefit of the cestui que trust, whether expressly directed by the donor, or performed according to the discretion of the trustee, is limited to the latter exclusively; and the trustee by force of it constituted, in all cases, the discretionary almoner of the donor's bounty. "In no other way," it is said, "can we give force to the word apply." It seems to me very clear, that the term is robbed of half its power by the restriction. "Use," also one of the most comprehensive words in our language, and adopted by the revisers for that reason, is *Page 310 
in this way held to mean a sort of benefit, conferred according to the discretion of a trustee: and "any person," as we have seen, to stand for some persons in particular.
There is nothing in the history of the law to give countenance to this construction. The section, as originally framed and passed, authorized a trust "to receive the rents and profits of lands, and apply them to the education and support, or either of them, of any person," c. By this provision, the trust was restricted to certain definite uses, education and support, but without limitation as to persons. A few months' reflection satisfied the revisers that a trust thus limited would not answer the exigencies of families or society, and on the 20th of April following, they recommended the substitution of "use," for "education and support, or either of them." They remark in their report, that the word "use" includes "education and support," and that "it will also include other purposes which ought to beprovided for." The revisers sought to generalize what was before specific. The construction in question, reverses this order, and gives to general terms, a special and restricted application.
A third reason assigned is, that a trust created in the language of this section or by equivalent words, would vest a discretion in the trustee as to the application of the trust fund; and hence it is inferred, that such discretion is in all cases essential. One obvious answer to this position is, that it was not the object of the legislature to prescribe a formula to be followed in the creation of a trust, but to designate in general terms the purposes for which they might be created. (3R.S. 582.) These general terms were intended to include within them an indefinite number of particular and special trusts, adapted to the exigencies of families, or the wants of individuals. If these terms are transferred from the statute to a trust deed, or a devise, they must necessarily give, as to all these particulars, a discretion to the trustee. For, in such case, the trust would confer upon the trustee all the power which the law conferred upon the author of the trust. But it by no means follows that the lawmakers intended that in all cases he should possess such discretion, under penalty of avoiding the trust. If the statute *Page 311 
should authorize married women to execute a power of attorney, to convey her interest in real estate, it might be as plausibly contended, that she could not designate the vendee, the terms of the sale, or the amount of the consideration, because a power in the words of the statute, or in equivalent terms, would give a discretion to the attorney in all these particulars. By adopting the language of this subdivision, the trustee, for example, must apply all the rents and profits to the use of the cestui que use. But Judge Bronson, in Hawley v. James, remarks, it can make no difference whether the trust extends to all the rents and profits, or is confined to a specified sum of money. The donor may settle for himself the amount to be applied.
But there is an obvious difference in the legal effect of an instrument requiring the trustee to apply the rents and profits of the lands conveyed, and one directing "a specific sum of money" to be applied out of those rents and profits, and yet both are within the statute, by the concession of the advocates of the construction in question. So the trust authorized by the same section of the statute, to sell lands for the benefit of creditors, if created in the language of the statute, would oblige the trustee to sell for cash, and to distribute the fund, when received, pro rata among all the creditors of the assignor. But the latter may, notwithstanding, direct that the proceeds be applied in discharge of a single debt, or a class of debts, in preference to others of the same character. The trusts, although different in terms and in their legal consequence, are both valid, and, for the same reason, they are each of them within the general purpose sanctioned by the legislature.
Another, and to my mind conclusive, answer to this proposition is, that under a trust created in the language of the statute, the discretion of the trustee (if it exist at all) is wholly unlimited as to the mode in which the trust fund is to be applied to the use of the cestui que trust. He may expend it for the education, or support, or to gratify the taste, or caprice, of the beneficiary. The doctrine is, that the discretion implied from the terms of the statute, is essential to the validity of the trust. If so, the donor can no more restrict that discretion, *Page 312 
than he can annihilate it. But it is conceded that he may direct a specific sum of money, less than the whole rents and profits, to be applied. This is a limitation of power. Again the revisers say that "Use includes education and support;" of course, if the statute is what they intended it should be, a trust to apply a specific sum for the education of any person designated, would be valid. But this is confining the trustee to a single use, instead of leaving to him, in the language of this section, the whole class of possible benefits, from which he might select one, or all, at his discretion.
Again, if a discretion is an essential element of a legal trust, I see no way to escape the conclusion, that the trustee must administer to the necessities of the cestui que trust, from day to day, and hour to hour. To avoid this absurdity, which was pointed out by the chancellor, it was distinctly admitted upon the argument, that the trustee was at liberty to pay over to the beneficiary, from time to time, sums of money "to be applied by him to his own use." This concession is a virtual surrender of the whole controversy. For if the discretion of the trustee is indispensable, in the application of the fund, he cannot delegate it to another, and certainly not to the beneficiary. In a word, the payment of a sum of money to the cestui que trust, is an application to his use, or it is not; if the former, it is authorized by the statute, and may be directed in the trust; if not, the trustee cannot make such payment in his own discretion or otherwise, without a violation of duty.
What, then, is an application "to the use of a person," within the statute? The advocates for a discretionary power in trustees over the fund, have told us that a payment over is not such an application, but have not informed us in what it consists. "To apply to the use of," is to execute the trust pro tanto. It issuch an application as will discharge the trustee from all responsibility on account of the fund, or the part of it, thus applied. This requires, 1st. The authority, express or implied, of the creator of the trust. 2d. An act of the trustee in pursuance thereof. 3d. The assent, in some form, of the beneficiary, where he has legal capacity; or of his committee or guardian, where *Page 313 
he has not. An application "to the use" of a person, like a delivery, or payment, implies an acceptance. The delivery of clothing to a madman, would no more be an application to his use, than the payment of money; for he has not the capacity to assent to either. The nature of the property applied is of no consequence, whether money or chattels. Judge Savage observed inLorillard's case, "that to apply rents and profits to the use, does not mean to pay them over to the cestui que trust. In that case he would apply them himself to his own use." In what other way can they be applied? If the learned judge had pursued the subject, he would have discovered that his remark applied with equal force, not only to a payment of money, but to every species of property, whether procured by the trustee, or otherwise. In the final analysis it would be found, that the beneficiary must in all cases apply the thing bestowed to his own use. The reason is, that the donee cannot be compelled to accept the gift, or any part of it. The trustee has to deal with free agents, when the beneficiaries have legal capacity, and with their legal guardians when they have not. He is trustee of the fund designed for their use, not a committee of their persons. If they refuse to accept what he has provided, and is ready to deliver, whether money, or necessaries, there is no application; the trust is unexecuted; the property remains in the trustee, subject to his control, and for it he alone is responsible. On the other hand, if the trustee, in pursuance of an authority written out in the trust deed, or implied from it, delivers to the cestui que trust money or other property for his use, and it is accepted by the latter, the trust is so far executed, the application made, and if within the next hour, the gift is squandered or destroyed, the trustee is exonerated.
Again, it is said that if a person is competent to take care of the money when paid over, there is no reason why the estate should not be transferred to him out of which it is raised. The same reason might be urged against trusts of personal property of this kind, which are confessedly authorized by the statute. But to be influenced by this suggestion, we must shut our eyes to the light of history and experience. Every one knows, that *Page 314 
there are individuals in every society, who are neither imbecile nor profligate, nor united with those who are so, who could properly dispose of a fixed income, and yet who ought not, from prudential reasons, to control the capital out of which it is raised. The difficulty does not lie in a want of capacity; but is to be found in their inexperience, the relation which they sustain to others, and sometimes in the nature of their pursuits. Of the men of the past age, whose labors in science and literature are now appreciated, how many might be named who, if living, would be deemed incompetent to manage an estate successfully. Yet men like these have their uses, although they know little of the value of property, or the modes of extracting rent from a refractory tenant. The statute does not exclude them from the class of beneficiaries; nor, as I read it, does it require a guardian or a trustee, to supervise their expenses; or make their degradation an essential condition of the trust. We are told that persons of this class can appoint agents to superintend their estates. So can the creator of the trust, and the law casts upon him this duty, whoever may be the cestui que trust. The chances of a judicious selection would be rather in favor of the man who provided the fund, than the one who was to expend the income.
And lastly, it is said that estates created under the third subdivision are inalienable; that a trust to pay over is passive, and opposed to the policy of our law, and the intention of a legislature. A trust to receive rents and profits, and pay them over, is essentially active in all its particulars. It was so at the common law, and is so now. (Jick. Anal. p. 15, note andcases; 3 R.S. 582, Revisers' notes.) To pay over is an active duty, and the successful management of real estate, with a numerous tenantry, demands not only integrity, but the exercise of vigilance, together with a knowledge of business, and of property. The revisers say, "that active trusts areindispensable to the proper enjoyment and management of property. They therefore propose to retain them, only limiting their continuance, and defining the purpose for which they may be created." (3 R.S. supra.) I think effect should be given to their design, and that *Page 315 
of the legislature. The objection, indeed, is rather to the policy of the statute, than the validity of a trust to pay over. If the law was more questionable than I believe it to be, it is no reason why it should be made more odious by construction.
The judgment of the superior court should be affirmed.