NEW YORK COUNTY.—HON. D. G. ROLLINS, SURRO-
GATE.—April, 1883.

MURRAY v. BRONSON.

*In the matter of the judicial settlement of the account of the surviving trustees of* MARY BRONSON, *deceased, under the last will of* ISAAC BRONSON, *deceased.*

Even in its solicitude to protect the claim of lineal descendants, a court cannot, on mere conjecture that a testator did not understand the language which he has used, reject such language, or give it a meaning other than the ordinary and primary one. The intention must be sought for in the language, and when that has received judicial construction, it must be interpreted in the light of such construction.

The word "issue," in a will, when used in correlation to "parent," in the absence of manifest indications that it is intended to have a broader import, means "children," and excludes remoter descendants.

Testator, who died in 1838, by his will executed in 1829, gave all his estate, with certain exceptions, upon specified trusts to trustees, directing that the same be divided equally among all his surviving children, and the *issue* of such as may be dead, "*who are to take what the parent of such issue would be entitled to, if living.*" He further provided that the principal of each daughter's share should remain in possession of the trustees, she receiving the income during life, and that, on the death of any daughter without issue, her portion should thereupon belong to his "*other children and their issue, subject to the restrictions and regulations aforesaid.*" M., a daughter, and the last surviving child of the testator, died, leaving no child or other descendant, but (1) nieces and nephews, testator's grandchildren, and (2) children of nieces and nephews who had died during her lifetime, testator's great grandchildren.—

*Held*, that, on M.'s death, the *corpus* of her trust portion was distributable *per stirpes*, exclusively among the grandchildren of testator,—the great grandchildren, children of deceased grandchildren, not being included among the "issue" of testator's children, within the intent of his will.

Palmer v. Horn, 84 *N. Y.*, 516—distinguished.

The will contained the following clause: "The portion which shall be divided or allotted to each of my daughters shall be designated in a deed delivered to such daughter declaring the trust, but shall remain in the possession of the trustees under this will, and be and continue her estate at law during her natural life, and the interest, rents, issues and profits only thereof *shall be paid to her as they accrue* during her natural life, and shall not be at the control of her husband or subject to his debts, but be to her sole and separate use."

By a codicil, executed in 1838, in which testator declared that he supplemented his will thereby in order "that the same may be more conformable to existing laws" (R. S.), he gave directions that the interest, rents, etc., of the portion of the estate allotted to any one of his daughters "shall by said trustees be *applied to the sole and separate use* of each daughter respectively for whom the same is holden in trust, and shall be exempt from the control and debts of her husband, and on receiving a receipt or discharge of any *cestui que trust*, executed under her hand to them acknowledging a sum applied to her use, said trustees shall be absolved from any further obligation in any way or manner to pay the same sum."

M., a daughter, dying intestate, there remained in the hands of the trustees interest, rents, etc., over and above the sums paid to her, exceeding $275,000. The question of the ownership of the accumulated income in the hands of the trustees had been determined by a judgment rendered by the supreme court, in an action brought by M., during her lifetime, against the trustees and all parties then interested in the estate.—

*Held*, that the matter was *res adjudicata*, the parties before the Surrogate, who were not parties to such action, being privies of their parents, who were parties to the latter; and that, accordingly, the sum in dispute must be paid over to M.'s administrator as having belonged, absolutely, to her at the time of her decease. ·

Bronson v. Bronson, 48 *How. Pr.*, 481—followed.

CONSTRUCTION of decedent's will upon the judicial settlement of testamentary trustees' account.  The facts appear sufficiently in the opinion.

NASH & KINGSFORD, *for  William Bronson, trustee.*

JAMES STIKEMAN, *for John J. Townsend, trustee.*

EVARTS, SOUTHMAYD & CHOATE, JAMES B. MURRAY, FRANKLIN BART-
LETT, G. V. BALDWIN, *and* J. A. MURRAY, *for Agnes Murray and others, grandchildren.*

SAMUEL JONES, A. S. HAMERSLEY, JR., G. W. VAN NESS, *and* J. F.
KERNOCHAN, *for Theo. B. Bronson and others, great grandchildren.*

THE SURROGATE.—The numerous progeny of this testa-
tor, who himself died in 1838, may be classified by gener-
ations as follows:

1st. Seven children survived him—all are now dead.

2d. Two of these seven left no child or other descend-
ant. The other five left children, and some child or
children of each of those five still live.

3d. There are also now living several grandchildren of
these five children of the testator.

4th. Some of the last class have living children who
are, therefore, great great grandchildren of Isaac Bron-
son.

Among the many descendants who are included in
class 3d, are eleven persons, great grandchildren of the
testator, who are children of his four deceased grand-
children, Marinus Willett, Isaac Bronson, Theodore B.
Bronson and Charlotte Winthrop.

The claim of these eleven persons, to share in a portion
of their ancestor's estate which is now ready for distribu-
tion, is one of the questions at issue in this proceeding,
wherein the account of the surviving trustees of a trust
created by the testator's will is to be judicially settled and
determined.

The original will was executed in 1829, and, so far as
it needs to be here considered, has the following provis-

ions: All the testator's estate, with certain exceptions, is given upon certain specified trusts to trustees, with the direction that the same be divided, from time to time, as soon and to as large an amount as its condition may admit, among all his surviving children equally, and the *issue* of such as may be dead, "*who are to take what the parent of such issue would be entitled to if living.*"

The will then says: "The portion which shall be divided or allotted to each of my daughters shall be designated in a deed delivered to such daughter declaring the trust, but shall remain in the possession of the trustees under this will, and be and continue her estate at law during her natural life, and the interest, rents, issues and profits only thereof *shall be paid to her as they accrue during her natural life*, and shall not be at the control of her husband or subject to his debts, but be to her sole and separate use; and on her decease, her portion shall be conveyed and delivered to her issue, to be and belong to such issue forever."

"If any of my daughters die without issue, her portion shall thereupon belong *to my other children and their issue, subject to the restrictions and regulations aforesaid.*"

The testator declares, in the introductory clause to his first codicil (executed in 1838, the year of his death), that he supplements his will thereby, for this reason, among others, "that the same may be more conformable to existing laws." The meaning of this expression will be hereafter considered.

By this codicil, he provides that the interest, rents, issues and profits of that portion of the estate which shall be allotted to any one of his daughters "shall, by said

trustees, be *applied to the sole and separate use* of each daughter, respectively, for whom the same is holden in trust, and shall be exempt from the control and debts of her husband, and on receiving a receipt or discharge of any *cestui que trust*, executed under her hand to them, acknowledging a sum applied to her use, said trustee shall be absolved from any further obligations, in any way or manner, to pay the same sum. If any of my daughters die without issue, her portion shall thereupon belong to my surviving children in equal parts, *and to the issue of such as are dead, who are to take what the parent of such issue would be entitled to if living.*"

A second codicil was executed in 1838, but its provisions are unimportant, so far as concerns the questions to be here determined.

Miss Mary Bronson, the last surviving child of the testator, has recently died intestate, and without issue. That portion of her father's estate hitherto held in trust for her is now to be distributed, as well as the interest and income of such portion, which, at the time of her decease, had accumulated, in the hands of her trustees, to the amount of more than $275,000—about $75,000 more than the *corpus* itself.

Two questions are thus presented for determination.

First. Are the great grandchildren of Isaac Bronson, children of such of his grandchildren as died during the life of Mary Bronson entitled to share in the *corpus* of this trust estate?

Second. Is the accumulated income, which has never been actually applied to the use of the *cestui que trust*, and is still held by the trustees, to be deemed subject, as part of the trust estate, to be distributed under the pro-

visions of the will of Isaac Bronson, or did it belong absolutely to his daughter Mary at the time of her decease, and should it now be paid over to the administrator of her estate?

## FIRST.

The decision of the first question depends upon the construction to be put upon the word "issue," as that word is employed in certain clauses of the will and first codicil.   This term has been a never failing source of perplexity to courts and counsel.

The tendency of judicial decisions in the last and in the early years of the present century was to hold that, wherever the troublesome word appeared in a will, unless there were manifest indications that it was meant to have a narrower import, it was broad enough to include all descendants, to the remotest generation (See Wythe v. Thurlston, *Amb., 554* [1748]; Gale v. Bennet, *Amb., 681* [1768]; Haydon v. Wilshere, *3 Term Rep., 372* [1789]; Hockley v. Mawbey, *1 Ves., 143* [1790]; Davenport v. Hanbury, *3 Ves., 257* [1796]; Freeman v. Parsley, *3 Ves., 421* [1797]).

This view seems to have been somewhat modified by the decision of Sibley v. Perry (*7 Ves., 522* [1802]), a case in which Lord Eldon held that the meaning of the word "issue," as used in a clause of a will there under consideration, was cut down by other parts of the instrument, so as to take in "children," only.   Soon after this decision, however, the doctrine was reasserted in Leigh v. Norbury (*13 Ves., 340* [1807]), that, unless limited by some indications of a contrary intention, the word "is-

sue," when used by a testator, was as comprehensive as the word "descendants."

A new phase of the question presented itself in Pruen v. Osborne (*11 Sim., 132* [1840]). A testator provided that a certain bequest should go to A., B. and C., or such of them, to use his own language, "as are now living, and the lawful issue now living of such of them as are dead having lawful issue, in equal shares, . . so, nevertheless, that the issue of any such . . persons" (that is of A., B. and C.), "respectively, as are dead shall, as between themselves, take *per stirpes* and not *per capita*, it being my intention that such issue, respectively, shall have only the share or shares to which his, her or their respective parent or parents would have been entitled if living." It was held that the word "issue," as here used, meant "children" only; the court saying: "I am of the opinion that, if there be nothing more in a will or other written instrument, whereby to construe the term 'issue,' than a direction that the 'issue' are to take the shares of their 'parent,' that is enough to confine the general meaning of the word 'issue' to the particular meaning of children of *that* parent . . . Therefore I have always considered it as settled that, in a will or in a deed, if it is a question whether the word 'issue' shall be taken generally or in a restricted sense, a direction that the 'issue' shall take only the shares which their 'parents' would have taken if living must be taken to show that the word 'issue' was used in its restricted sense."

In 1846, followed Farrant v. Nichols (*9 Beav., 327*). The expression, in a will, "the issue of my daughter, whether sons or daughters," was, for manifest reasons,

held to be restricted to children of the testator's daughter.

In 1849, was decided the case of Edwards v. Edwards (*12 Beav., 97*). The expression "issue," the court there says, may mean all the descendants in every degree, or may be used in a more limited sense. When used ambiguously or equivocally, its meaning must be collected either from the immediate context, or by reference to the mode in which it is elsewhere used in the instrument. Upon the facts of that particular case, it was decided that, although the testator had first used the disputed word equivocally, subsequent provisions of his will showed that he intended to give it its restricted meaning of "children."

So, too, in Pope v. Pope (*14 Beav., 591* [1851]), a testator, after using the word "issue," provided that, if such "issue" should die leaving "issue," the "issue" of such "issue" should stand in the place of his or her "parent," etc. The court, while reiterating the doctrine that the word "issue" should, *prima facie*, be deemed the equivalent of the word "descendants," held that a provision for the *issue of issue* showed, of itself, that the term "issue," as first used, was not intended to have its comprehensive meaning.

Bradshaw v. Melling (*19 Beav., 417*) was decided in 1853. A testator devised and bequeathed a certain part of his estate to eight persons (naming them), during their lives, and further provided as follows: "In case any of them, the said eight legatees, shall depart this life without leaving lawful issue, I order and direct that the share or shares of him or her, so dying, shall go among the survivor or survivors of them . . . and in case any

of them, the said legatees, shall depart this life leaving lawful issue, I direct that the share . . . of the rents and profits of him, her or them, so dying, shall go and be paid unto and equally among such issue, if more than one, and if only one, then to such one child alone during the lifetime of the survivor of them, the said eight legatees, and from and after the decease of the survivor . . . I give and devise all my estate . . . unto the lawful issue then living of the said legatees, their heirs and assigns forever . . . it not being my intention that the issue of my said legatees shall take in equal shares all together, but only in equal proportions as respects their deceased parents or parent." Without discussion, and upon the authority of Sibley v. Perry, and Pruen v. Osborne (*supra*), the court held that the word "issue" was restricted to the "children" of the eight original legatees.

The case of Ross v. Ross (*20 Beav., 645*) was determined in 1855. It required the interpretation of the following provision in a will: "For the benefit of all and every the child and children of Christian Ross who shall be living at the time of her decease, and of the issue, if any then living, of such of her children as may have died in her lifetime, each of her said surviving children to take an equal share, and the issue, *if more than one,* of such of her children as may have died in her lifetime to take equally amongst them the part or share which their parent would have been entitled to, if he or she had survived the said Christian Ross, and, *if but one, then to take a child's share."*

The Master of the Rolls, while maintaining the old doctrine that the word "issue" presumptively included all

"descendants" (so that the burden of proof lay upon him who contended for a restrictive interpretation), reasserted also the principle that, whenever the word "issue" was used in immediate association with the word "parent" its meaning was limited to the children of such parent; but he declared, upon consideration of all the provisions of the will then under review, that the word issue was not there limited to the children of the first taker, because, in that particular case, the word "parent" could properly be held to refer not only to the children but to a grandchild of Christian Ross. "This," the court said, "is the only way in which the various parts of the will can be made quite consistent."

The embarrassment thus suggested as attending, in the case of Ross v. Ross, any other construction of the word "issue" than that which the court actually adopted, arose from the fact that there was there a gift over, in terms which were not calculated to restrict the meaning of the disputed word. This made it appropriate to give it a similar construction in other portions of the will, where it was used somewhat ambiguously.

On the other hand, if in those portions, and in connection with the original gift, it had been construed as meaning "children," the same restrictive interpretation would have seemed necessary in respect to the gift over. The taking effect of the latter gift would, in that case, have excluded certain remote descendants for the benefit of strangers—a construction which the court sought to avoid.

There was another ground, upon which the Master of the Rolls distinguished this case of Ross v. Ross from that of Pruen v. Osborne, and justified himself in giving to the word "issue" its broader meaning. That was the

testator's use of the expression (see *ante*, in the quotation from the will), "and if but one, then to take a child's share."

By a process of reasoning which it is somewhat puzzling to understand, these words were discovered to have an important effect on the rest of the sentence and to enlarge the meaning of the word "parent" beyond its ordinary limitations (*20 Beav.*, *645*, at p. *653*).

Maynard v. Wright (*26 Beav.*, *285*) was decided in 1858. It reiterated that the word "issue," unless somehow restricted, should be regarded as a *nomen generalissimum*, including the latest descendants, but it reasserted, also, that, where the term "issue" was used correlatively with the term "parent," it referred to the children of such parent, and not to remoter descendants.

In the reports for the same year (1858) appears the case of Smith v. Horsfall (*25 Beav.*, *628*). A bequest was there given to such of five specified cousins of the testator as should be living at the time of his death, and to the issue of such of them as should be then dead leaving lawful issue, share and share alike, such issue respectively taking a parent's share only. One of the five cousins died in the testator's lifetime, leaving three children and three grandchildren (children of deceased children), all of whom survived the testator himself. Upon this state of facts, the Master of the Rolls made only this brief comment: "The word 'parent' applies to the five persons named (the cousins), and the 'issue' of those persons who were to take a parent's share means the 'children.' That is the only way in which I can construe this will."

Then follows a reference to Ross v. Ross (*supra*), pointing out the distinction between that case and the one then

at bar. "In Ross v. Ross," says the court, "there was a gift to A. for life, and afterwards to her children living at her decease, and the issue of such of her children as might have died in her lifetime, the issue of such deceased children to take equally the part which the parent would have been entitled to, *and if but one, then to take a child's share*. One child died in the life of A., leaving no child, but a grandchild, and the question was whether that great grandchild of A. could take a share as 'issue.' I was of opinion that 'issue' was confined to the children of the 'parent,' but that the parent herself might be a grandchild of A. Here (*i. e.*, in Smith v. Horsfall) it is given direct to the five cousins who should be living at the decease of the testator, and to the issue of such of them as should then be dead, and the issue to take a parent's share only. 'Issue' here means 'children'—and that is its signification in all such cases, where a direct reference is made to the parent of the issue. I entertain no doubt on the point, and I should be unsettling the law if I were to hold the contrary."

M'Gregor v. M'Gregor (*1 DeG., F. & J., 66* [1859]), affords another instance of a restricted use of the word "issue." So does Rhodes v. Rhodes (*27 Beav., 416* [1859]). And so does Stevenson v. Abingdon (*31 Beav., 305* [1862]). And so does Lanphier v. Buck (*11 Jur., N. S., 837* [1865]). Ross v. Ross (*supra*) was approved in the recent case of Ralph v. Carrick (*11 L. R., Ch'y Div., 873* [1879]). Certain comments were there made by the learned judges composing the court; as to what was the precise matter determined in Sibley v. Perry (*supra*), and as to supposed erroneous constructions which had been put upon Lord Eldon's decision in that case.

"It is much to be regretted," said James, L. J., "that

Sibley v. Perry was ever made a leading case; because, according to the report of what Lord Eldon himself said, it is perfectly clear that he never intended to lay down any general rule or canon of construction, but was dealing only with the peculiar language of the will in that particular case."

There are criticisms of a similar character by other members of the court. I do not, however, regard the decision in Ralph v. Carrick as overturning or even seriously modifying the rules of interpretation which had obtained in England during the previous half century. The case was one in which the testator had directed that, in the event of his death without lawful issue (which event happened), and after the death of his wife, certain residue of his estate should be divided into twelve equal portions. He further provided that three of such portions should be given equally to the children of his aunt, Mrs. Monteath, the *descendants* of those who might have died being entitled to the benefit which their deceased parent would have received had he or she been then alive, . . . and, should there be no such children or lawful *descendants*, then to the general residuary estate.

A great grandson of Mrs. Monteath, whose parent and grandparent had both died before the death of the testator, claimed under this provision of the will. It will be seen that the word "issue" was not formally before the court for construction. The word to be interpreted was the word "descendants," and to this word, although used in immediate correlation with the word "parents," was allowed its broadest meaning. The court intimated, it is true, that, if the word "issue" had appeared in the place of the word "descendants," it would have made no differ-

ence. But this liberal view, as the court explained, was chiefly because of a gift over, which very clearly was to take effect only on failure of *all the descendants*, and was but a recognition, therefore, of the well known rule of construction that, when there are ambiguous words in the original gift, a gift over should not be interpreted in a restrictive sense which it would not otherwise bear; but, on the contrary, the ambiguous words in the previous gift should be so construed as to agree with the unambiguous words in the gift over.

I have dwelt at length upon these English decisions, because, so far as I have discovered, the precise question presented in the case at bar has been little discussed in the courts of this country.

Palmer v. Horn (*84 N. Y., 516*) has been cited upon both sides of the present controversy, but between that case and this there are great dissimilarities. The words there interpreted were the following: "To divide the sum of $20,000 into as many shares as there shall be *lawful issue* of my deceased nephew Matthew living at my death, and to apply the interest, etc., to the use of the *said children* respectively, and as they respectively depart this life to pay over the principal to their lawful issue, share and share alike."

Here the meaning of the word "issue" was held to be cut down by the use of the word "children," so as to exclude the representation of one of Matthew's daughters, who had died before the testator, but had left children who survived her.

In support of the claim that the great grandchildren of Isaac Bronson are entitled to share in the distribution upon the present accounting, I have been referred to sev-

eral other decisions of the courts of New York. Among these, are Barstow v. Goodwin (*2 Bradf.*, *413*); and Hamlin v. Osgood (*1 Redf.*, *409*). In both these cases, the word "descendants" was the one in dispute, and not the word "issue." As to Wylie v. Lockwood (*86 N. Y.*, *291*), I am unable to see its application to the present contention.

The restricted meaning of the word "issue," appearing under circumstances somewhat similar to those which are here the subject of consideration, is upheld in King v. Savage (*121 Mass.*, *303*); Edwards v. Bibb (*43 Ala.*, *666*); Moore v. Moore (*12 B. Mon.*, *655*); McPherson v. Snowden (*19 Md.*, *197*); 2 Redf. on Wills, 37.

In view of this long line of authorities, I hold that, under Isaac Bronson's will, the trust estate of his deceased daughter Mary, all her brothers and sisters being dead, must be divided, *per stirpes,* among the children of such brothers and sisters, to the exclusion of the grandchildren, whether they are children of living or deceased parents.

The fact that this interpretation will exclude certain of the testator's descendants, who, in the event that he had died intestate, would have been entitled to take as his next of kin, will not justify any construction at variance with the plain import of his language. It is true, as has been urged, that even so narrow a term as "children" has, in some cases, been held to include remote issue (Prowitt v. Rodman, *37 N. Y.*, *42*; Earl of Tyrone v. Marquis of Waterford, *1 DeGex, F. & J.*, *613;* Low v. Harmony, *72 N. Y.*, *408;* Scott v. Guernsey, *48 N. Y.*, *106*). But all these cases have turned upon points which are not involved in the case at bar. Even in its solici-

tude to protect the claim of lineal descendants a court cannot, on mere conjecture that the testator did not understand the language which he has used, reject such language, or give it a meaning other than the ordinary and primary one. The intention must be sought for in the language, and when that has received judicial construction it must be interpreted in the light of such construction (1 Redf. on Wills, 439; Palmer v. Horn, *84 N. Y., 516;* Earl of Orford v. Churchill, *3 Ves. and B., 69;* Keteltas v. Keteltas, *72 N. Y., 312*).

It may or may not have been the wish of Isaac Bronson that, in the contingency which has now arisen, his great grandchildren should receive a share of his bounty. It is profitless to indulge in conjectures upon the subject, save so far as they properly arise from scrutiny of the will and the codicils. It is in those instruments that the testator has disclosed his whole purpose so far as this court can know of it. "The use of the expression that the intent of the testator is to be the guide, unaccompanied by the constant explanation that it is to be sought in his words, and a rigorous attention to them, is apt to lead the mind insensibly to speculate upon what the testator may be supposed to have intended to do, instead of strictly attending to the true question, which is—*what that which is written means.*" Lord WENSLEYDALE, in Abbott v. Middleton (*7 H. L. C., 68*).

It was claimed by one or more of the counsel, upon the argument of this question, that the estate, given by the testator to the brothers and sisters of his daughter Mary, upon her dying without issue, was a vested remainder; and that that circumstance was sufficient to take the case out of the established rule. The latter

part of the contention seems to me to be ill founded, even if the former be correct; for admitting that the testator's children, other than Mary, took a vested interest in remainder in the trust set apart for her use, such interest was certainly divested by their dying in Mary's lifetime. I think, too, that the first proposition is equally unsound.

## SECOND.

There remains to be considered the question touching the ownership of the accumulations to the trust fund. If these accumulations were the absolute property of Mary Bronson at her death, they are now a part of her estate, and must of course go to her legal representatives ; if otherwise, they must be distributed among the same persons entitled to take the *corpus* of the trust.

The will, as distinguished from the codicils, directed that the rents, income, etc., of each daughter's portion should be *paid to her as they accrued* during her natural life. The first codicil, executed after the passage of the Revised Statutes, provided that such rents, income, etc., should be *applied to the sole and separate use* of such daughters respectively. The introductory words which have been already quoted from this codicil indicate a doubt in the mind of the testator whether the trust "to pay over," created by the will, would be valid under the restrictions of the statutes as revised.

It seems clear to me that his change of language involved no change of purpose, but sprang, on the contrary, from his determination to bring the spirit of his original bequest into closer correspondence with the language of the new law. His anxiety was not an idle one. For

though, eleven years after Mr. Bronson's death, Leggett v. Perkins (*2 N. Y., 297*) established that, even if the codicil had never been made, the trust created by the will itself would have been valid under the Revised Statutes, that decision was reached by a divided court, and settled what is generally conceded to have been a doubtful controversy. That controversy, however, has never been revived, and the decision which crowned it has never been reversed or modified (Moore v. Hegeman, *72 N. Y., 376*). And it has established, among other things, that a trust which gives to the trustee no discretion in respect to the amount he shall pay to or apply to the use of his *cestui que trust* is valid within the statute.

If, then, the direction, in this testator's codicil, that his trustees shall "apply" the interest, rents, issues and profits of each daughter's trust estate "to the use of" such daughter, coupled with the further direction that her mere acknowledgement (in the form of a written receipt or discharge) of any sum paid to her shall, to that extent, absolve the trustees from all obligation respecting such sum, is to be regarded as substantially a republication of the original provision in the testator's will, it seems to me that the trustees had no discretion to withhold from any of such daughters any portion of the interest, income, etc., derived from the principal of her trust fund, and that such daughter could at any time have enforced a demand for the whole amount not already paid over. This view is not at variance with the decision in Donovan v. Van de Mark (*78 N. Y., 244*), Ireland v. Ireland (*84 N. Y., 321*), or Willets v. Titus (*14 Hun, 554*). In each of those cases, there were words in the will distinctly importing discretion in the trustees.

The case of Moore v. Hegeman (*72 N. Y., 376*) lends efficient support to the theory that the direction in the will to "pay" was not modified by the direction in the codicil to "apply." In that case, a testator provided that income in trust for certain children should be annually "applied" to their education and support, while they remained under age (the amount, within a specified *maximum* limit, to be determined by the discretion of the trustees), and that, after their respectively coming of age, they should be "paid" the whole of such income.

It was contended that this trust was illegal; that a provision to "pay" had been held valid (by Leggett v. Perkins, *supra*) only when used as an equivalent to "apply," and that, as both words were employed in the will under consideration, and employed in some sense antagonistically, the trust could not be upheld.

But Miller, J., pronouncing the opinion of the court, says: "I am unable to discover that there is any want of harmony in the words referred to. They are substantially equivalent to each other, and whether the sums mentioned are 'applied' or 'paid over' for the benefit of the children, can make but little difference, as the object is the same—the benefit of the children. They are to receive the avails, and reap all advantages from the income, under all circumstances. One phrase refers to the minority of the children, and the other applies when they have arrived at full age, but there is no real legal distinction between the two."

It is insisted, however, that, even if the trustees of Mary Bronson were clothed with no discretion as to the amount they should apply to her use, and would have been obliged to pay over the entire income if requested,

nevertheless the fact that, at the time of her death, there remained in the hands of the trustees large sums of money which they had not in fact paid over to her, or in any fashion applied to her use, is an important element in the problem; and that what she neither received nor demanded must merge in the principal of the trust. It does not seem so to me. *Why* could she have demanded and enforced her demand if it had met with refusal, except that she *owned* and was therefore entitled to *receive* what she *demanded?* And, if she owned, it did not matter whether she made few or frequent calls upon her trustees for much or little. That which she left in their hands no less belonged to her than that which she drew out. It vested in her as fast as it accrued.

Such was the view which Van Brunt, J., took of the question here presented, as appears by his opinion in Bronson v. Bronson (*48 How. Pr., 488*). Miss Mary Bronson was plaintiff in that action, and the trustees under her father's will, together with all parties then interested in this estate, were defendants. The question for determination was the ownership of such income as had at that time accumulated in the hands of Miss Bronson's trustees. I quote from the opinion of Mr. Justice Van Brunt:

"If, upon an examination of the will and codicil, we should come to the conclusion that it was the intention of the testator that the rents, issues and profits of the portion allotted to any one of his daughters should belong to her absolutely, such intention must control the determination of the question now under consideration. I am unable to see how it is possible, after an examination of the provisions of the will and codicil, to come to

any conclusion other than that such was the testator's intention.   In his will, he provides that the rents, issues and profits of each daughter's portion shall be paid to her as they accrue, and, upon her death, he disposes of nothing but the portion of the daughter, making no allusion whatever to accumulations; in fact, there could be no accumulations if the terms of his will were complied with, and the income of the daughter's portion was paid over as it accrued, and as the will directed.   An examination of the codicil in respect to the daughter's portion, will show that the trustees, although directed to apply to the sole and separate use of each daughter the income of her portion, were not expected to attend personally to such application, because the receipt of each daughter, acknowledging a sum applied to her use, completely absolved the trustees from any further obligations in respect to said sum.   And it will be observed that the codicil is equally silent with the will as to any accumulations, although exceedingly precise as to what shall be done with the original share or portion upon the decease of any of his daughters.   I am clearly of opinion, from these circumstances that the testator undoubtedly intended that the whole of the income of the portion of his estate allotted to each daughter should belong absolutely to her, to be disposed of as she saw fit. . . . . . . The conclusions, therefore, to which I have come, upon the questions submitted to me for decision, are: . . . .

. . . . That all the income derived from the plaintiff's portion of her father's estate, and which has been allowed to accumulate in the hands of the trustees, belongs to her, and that she is entitled to claim the payment of the same to her by the trustees, upon presenta-

tion of a proper receipt therefor. Judgment is ordered accordingly."

It is now claimed that the "judgment accordingly" is not in entire harmony with the views expressed in this opinion. The ninth and tenth clauses of that judgment are as follows:

" 9. That all the income derived from the plaintiff's portion of her father's estate, and which has been allowed to accumulate in the hands of the trustees, whether invested or not, belongs to said plaintiff Mary Bronson, and she is entitled to claim the payment and transfer of the same to her by the trustees, upon presentation to them of a receipt, as required by the will of Isaac Bronson. That, until such accumulated fund is paid and applied to her use in accordance with the provisions of said will, *the same remains in the hands of the said trustees as part of the trust estate,* and, upon paying out the same, the said trustees are entitled to receive their lawful commissions thereon.

" 10. That the said trustees forthwith pay and transfer and deliver said income and accumulations, and the securities in which the same is invested, to the plaintiff, or her authorized agent, *upon such receipt being given.*"

Some of these words are not happily chosen, if they are designed to embody the conclusions so aptly stated in the opinion of the court. For example, that portion of clause 9, which declares that, until the "accumulated fund is paid and applied," it "remains in the hands of the said trustees *as part of the trust estate,*" is plausibly sought to be construed by some of the parties hereto as a determination that such accumulations could only cease to be a part of the testator's estate, and distributable as such

under his will, by an actual payment to Mary Bronson or an actual application to her use. So, too, it is claimed that her title to such accumulations was made conditional upon her first presenting a receipt therefor.

I do not so interpret the judgment. As to that part of it which refers to the production of a receipt, it may fairly be held to mean that, before the *cestui que trust* could be awarded *possession* of the accumulations, she should be required to give a receipt therefor.. It by no means makes her *title* dependent upon the production of such a document. Moreover, the direction that, until the accumulated fund was paid and applied, it should remain as part of the estate in the hands of the trustees, is, as it seems to me, very far from a determination that, for failure to demand and receive, the *cestui que trust* should be deprived of her title. It does not appear that the contingency of her death at a time when accumulations were still in the hands of her trustees was in the minds of the parties, or was intended to be provided for by the court. In my judgment, the clause simply means, as one of the counsel claims, that "trustees collecting funds for a life tenant hold the funds *as* trustees until they are paid over, and so taken out of their character as trust funds."

As a result of the consideration which I have given to this subject, I hold, therefore, that the accumulation of Mary Bronson's trust estate ought to be paid over to her administrator. This would be my view, even if the matter were not *res adjudicata*. But I think it is. The parties to this proceeding, who were not parties to that in which the judgment was obtained, were privies of their parents, who were themselves parties to the former proceeding.

A decree may be entered in conformity with this decision.